Anthony HERBERT, Plaintiff-Appellee,

v.

Barry LANDO, Mike Wallace, Columbia Broadcasting System, Inc., Atlantic Monthly Company, Defendants,

Barry Lando, Mike Wallace and CBS Inc., Defendants-Appellants.

No. 28, Docket 77–7142.

United States Court of Appeals, Second Circuit.

Argued Sept. 2, 1977.

Decided Nov. 7, 1977.

Certiorari Granted March 20, 1978. See 98 S.Ct. 1483.

Floyd Abrams, New York City (Dean Ringel, Kenneth M. Vittor and Cahill, Gordon & Reindel, Carleton Eldridge, Jr., Paul Byron Jones, and Coudert Brothers, Richard G. Green, Adria S. Hillman and Green & Hillman, New York City, of counsel), for defendants-appellants Barry Lando, Mike Wallace, and CBS Inc.

Jonathan W. Lubell, New York City (Mary K. O'Melveny, Samuel Estreicher, and Cohn, Glickstein, Lurie, Ostrin & Lubell, New York City, of counsel), for plaintiff-appellee, Anthony Herbert.

Richard Schmidt, Jr., Washington, D. C. (Cohn & Marks, Washington, D. C., of counsel), Dan Paul, Miami, Fla. (Paul & Thomson, Miami, Fla., of counsel), James C. Goodale, New York City, Daniel Feldman, Chicago, Ill. (Isham, Lincoln & Beale, Chicago, Ill., of counsel), Corydon B. Dunham, New York City, J. Laurent Scharff, Washington, D. C. (Pierson, Ball & Dowd, Washington, D. C., of counsel), filed a brief for the American Society of Newspaper Editors, Chicago Sun-Times, Chicago Daily News, The Miami Herald Publishing Co., National Broadcasting Co., Inc., The New York Times Co., and Radio Television News Directors Ass'n, amici curiae.

Before KAUFMAN, Chief Judge, and OAKES and MESKILL, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

█ The seemingly narrow issue before us—the scope of protection afforded by the First Amendment to the compelled disclosure of the editorial process—has broad implications. Called upon to decide whether, and to what extent, a public figure bringing a libel action may inquire into a journalist's thoughts, opinions and conclusions in preparing a broadcast, we must address initially the fundamental relationship between the First Amendment guarantee of a free press and the teaching of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In accommodating both these interests within our constitutional scheme, we find that due regard to the First Amendment requires that we afford a privilege to disclosure of a journalist's exercise of editorial control and judgment.

I

Almost two centuries ago, James Madison decried the Sedition Act of 1798 as a basic departure from our nation's commitment to a free and untrammeled press. He wrote,

> Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press.[1]

The force of his words has not diminished over time. We still recognize that an unrestrained press plays a vital role in the marketplace of ideas and that, without active trade in that marketplace, democracy cannot survive. Cf. *Garrison v. Louisiana*, 379

---

1. VI Writings of James Madison, 1790–1802, p. 335 (Hunt ed. 1906).

U.S. 64–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).[2]

Invoking the broad words of the First Amendment, the Supreme Court has never hesitated to forge specific safeguards to insure the continued vitality of the press. It has repeatedly recognized the essentially tripartite aspect of the press's work and function in: (1) acquiring information,[3] (2) 'processing' that information and (3) disseminating the information. The Supreme Court was aware that if any link in that chain were broken, the free flow of information inevitably ceases.[4]

The dissemination of news has long been accorded constitutional protection.[5] In *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), Chief Justice Hughes, writing for the Court, struck down a Minnesota statute which allowed the state to enjoin the publication of newspapers containing "malicious, scandalous, and defamatory" matter. The Chief Justice noted that prior restraints on the press were impermissible, notwithstanding the possibility that the information suppressed was libelous. In particular, the fundamental obligation of the press to act as a fourth branch in disclosing official misconduct was stressed:

> The administration of government has become more complex, the opportunities for malfeasance and corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials . . . emphasizes the primary need of a vigilant and courageous press. *Id.*, 283 U.S. at 719–20, 51 S.Ct. at 632.

The tenet expressed in *Near* that prior restraints on publication will not lightly be tolerated has, time and time again, been reiterated under circumstances which accentuate Chief Justice Hughes's concerns. See, e. g., *New York Times v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).[6]

Such anticipatory censorship is not even justified by the presence of a countervailing constitutional interest such as an individual's Sixth Amendment right to a

---

**2.** The notion that the free exchange of information is vital to a democracy is a longstanding principle of the First Amendment. See *Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). See also A. Meiklejohn, *Free Speech and Its Relation to Self-Government*, 88–9 (1948).

**3.** The support given by the press to the passage of "right to know" and "open meeting" statutes is based on its vital need to acquire information. See Note, *Freedom of Information: The Statute and the Regulations*, 56 Georgetown L.J. 56 (1967); Note, *Open Meeting Statutes: The Press Fights for the Right to Know*, 75 Harv.L.Rev. 1199 (1962).

**4.** See generally Note, *The Rights of the Public and the Press to Gather Information*, 87 Harv. L.Rev. 1505 (1974).

**5.** The First Amendment cases which protect picketing exhibit like concern with the need to disseminate information. In a landmark case, *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) Justice Murphy wrote,
> In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within

that area of free discussion that is guaranteed by the Constitution . . . Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion on matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests. *Id.* at 98–99, 60 S.Ct. at 744–755.

See also *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 1242 (1938) (an ordinance prohibiting the distribution of "circulars, handbills, advertising, or literature of any kind" without the prior permission of city official invalid on its face); *Martin v. Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (prohibition of door-to-door canvassing for purposes of disseminating religious literature invalid as a prior restraint).

**6.** See also *Teitel Film Corp. v. Cusack*, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). See, for a historical overview of the prior restraint doctrine, Emerson, *The Doctrine of Prior Restraint*, 20 Law & Contemp. Prob. 648 (1955).

fair trial.[7] Before imposing a gag order, the judges have been admonished that they must carefully consider alternative methods to mitigate the effects of pre-trial publicity. Change of venue and other procedures have been suggested. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

Nor has the Supreme Court shown any hesitation to invalidate restraints on the press which do not follow conventional patterns where it finds the free flow of information imperiled. In *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), the Court struck down a tax imposed by the State of Louisiana on newspaper advertisements because it was graduated to reflect circulation levels.[8] The Court opined that such a tax would lower advertising revenues and restrict circulation. *Id.* at 244–5, 56 S.Ct. 444.[9] Even the one governmental control—antitrust legislation—that has long been applied to the press and does not contravene the First Amendment has been justified by its instrumental role in insuring the broad distribution of news:

> The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary. That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945).

■ The acquisition of newsworthy material stands at the other pole of the press's function. Freedom to cull information is logically antecedent and necessary to any effective exercise of the right to distribute news. Indeed, the latter prerogative cannot be given full meaning unless the former right is recognized. See Note, *The Right of The Press to Gather Information*, 71 Col.L. Rev. 838 (1971).

The Supreme Court has acknowledged this compelling need.[10] In *Branzburg v. Hayes*, 408 U.S. 655, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Court recognized the right of the press to gather information, since "without some protection for seeking out the news, freedom of the press could be eviscerated." *Id.* at 681, 92 S.Ct. at 2656. Justice Powell, in a concurring opinion, articulated the principle that news gathering is afforded constitutional protection even in the rare case where a reporter was directed to disclose his sources to a grand jury. He noted that a reporter would not be required to furnish information to a grand jury bearing only a remote and tenuous relationship to the subject matter of its investigation. *Id.* at 711, 92 S.Ct. 2646. See also Goodale, *Branzburg v. Hayes and the Developing Privilege for Newsmen*, 26 Hastings L.J. 709 (1975).[11]

---

7. Of course, the court can exercise its authority to maintain an atmosphere of impartiality and calm in the courtroom. See *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). The exercise of such control however, in no way implies a right to abridge expression itself.

8. The Supreme Court unanimously held the statute invalid. Justice Sutherland, writing for the Court, analogized the statute to pre-Revolutionary "taxes on knowledge" designed to "prevent, or curtail the opportunity for the acquisition of knowledge by the people in respect to their governmental affairs." 297 U.S. 247, 56 S.Ct. 448.

9. For a collection of materials on the problem of taxation of the press, see T. Emerson, *Political and Civil Rights in the United States*, 602–4 (3d ed. 1967). Many state court decisions have followed *Grosjean*. See, e. g., *Mayor of Balti-*

more *v. A. S. Abell Co.*, 218 Md. 273, 287, 145 A.2d 111, 118 (1958).

10. While we discuss only the articulation of this right to gather information as it pertains to the press, the Supreme Court has acknowledged a similar right with respect to free speech. In *Martin v. City of Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), the Court invalidated a municipal ordinance forbidding door-to-door distribution of handbills as violative of the First Amendment rights of *both* the recipients and the distributors.

11. Although the Court in *Branzburg* expressed the need to protect journalists' sources, it did not suggest that the press enjoyed a special right of access to information not generally available. See also *Saxbe v. The Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41

This court has elaborated on the privilege established by *Branzburg*. In *Baker v. F & F Investment*, 470 F.2d 778, 782–3 (2d Cir. 1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973), we held that a reporter did not have to disclose the source of an article he had written about block-busting in Chicago, although subpoenaed to do so in a class action charging racial discrimination. We noted that "there are circumstances . . . in which the public interest in non-disclosure of a journalist's confidential sources outweighs the public and private interest in compelled testimony." *Id.* at 782. The nature of that public interest was clear: the stream of information would rapidly run dry if confidential sources, fearing the disclosure of their identities, remained silent.[12]

■ The constitutional protections afforded the dissemination and acquisition of information has inevitably led the Supreme Court to recognize that the editorial process must equally be safeguarded. The media is not a conduit which receives information and, senselessly, spews it forth. The active exercise of human judgment must transform the raw data of reportage into a finished product. The Supreme Court cases which grant protection to the editor so shaping the news are unequivocal in their terms. In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the Court unanimously held that a newspaper could not be compelled by the state to accept editorial replies. The Court recognized that the treatment of public issues and officials—whether fair or unfair—constituted the exercise of editorial control and judgment, and that the existence of a right of reply statute would unconstitutionally burden an editor's exercise of judgment in choosing whether or not to print newsworthy material. *Id.* at 257, 94 S.Ct. 2831.

The Court in *Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) had, a year earlier, presaged the unqualified statement of *Tornillo*.[13] In holding that

L.Ed.2d 514 (1974) (press does not have a constitutional right to interview prison inmates). However, Justice Stewart, who wrote the opinion for the Court in *Saxbe*, subsequently noted that the freedom of the press is a structural provision of the Constitution, and therefore unique. Stewart, *"Or of the Press,"* 26 Hastings L.J. 631 (1975).

12. Of course, our holding in *Baker* did not depend upon either the New York or Illinois statutes regarding newsmens' privilege. There, as in *Garland v. Torre*, 259 F.2d 545 (2d Cir.), *cert. denied*, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958), the First Amendment compelled our conclusion. Under similar circumstances, the disclosure of confidential sources ·has been privileged. In *Cervantes v. Time, Inc.*, 464 F.2d 986, 992–93 (8th Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973), the court held that a publisher was not required to disclose his sources since the plaintiff's libel action was not likely to succeed. See also *Apicella v. Mac Neil Laboratories, Inc.*, 66 F.R.D. 78 (E.D.N.Y.) (court refused to order the editors of a medical newsletter to disclose their confidential sources, although those sources possessed information relevant to plaintiffs' allegations of adverse drug effects). But see *Carey v. Hume*, 160 U.S.App.D.C. 365, 492 F.2d 631 (1974), *cert. dismissed*, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974) (court ordered disclosure of a confidential source where the allegedly libelous statement was based *entirely* on confidential sources and the plaintiff had no way of proving falsity or reckless disregard without knowledge of the identity of those sources). See generally Comment, *Newsmen's Privilege Against Compulsory Disclosure of Sources in Civil Suits—Toward an Absolute Privilege?*, 45 U.Colo.L.Rev. 173 (1973).

13. The Court's active consideration of the broadcast medium began, of course, with *Red Lion Broadcasting v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). There, the Supreme Court rejected the broadcaster's challenge, on conventional First Amendment grounds, to the fairness doctrine and to the FCC's "right of reply" rules. The rationale for the Court's holding is strikingly similar to that used in upholding the application of the antitrust laws to the press. Justice White observed,

Where there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish. . . . It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which the truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee. . . . . It

broadcasters were not required by the First Amendment to accept paid political advertisements, the Court observed: " . . . For better or worse, editing is what editors are for; and editing is selection and choice of material." Specifically, in addressing the issue of whether broadcaster's decisions constituted state action, Chief Justice Burger noted,

> . . . it would be anomalous for us to hold, in the name of promoting the constitutional guarantees of free expression, that the day-to-day editorial decisions of broadcast licensees are subject to the kind of restraints urged by respondents. To do so in the name of the First Amendment would be a contradiction. *Id.,* 412 U.S. at 120–1, 93 S.Ct. at 2095.

█ It is clear from what we have said that newsgathering and dissemination can be subverted by indirect, as well as direct, restraints. It is equally manifest that the vitality of the editorial process can be sapped too if we are not vigilant. The unambiguous wisdom of *Tornillo* and *CBS* is that we must encourage, and protect against encroachment, full and candid discussion within the newsroom itself. In the light of these constitutional imperatives, the issue presented by this case is whether, and to what extent, inquiry into the editorial process, conducted during discovery in a *New York Times v. Sullivan* type libel ac-

is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. *Id.* at 388–90, 89 S.Ct. at 1806–07.

**14.** Appellants, in their brief, succinctly frame the issue before us:

What effect should be given to the First Amendment protection of the press with respect to its exercise of editorial judgment in pretrial discovery in a libel case governed by *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)?

On this appeal, appellants do not ask that we review the specific discovery rulings of the District Court. They seek only that we articulate a general principle delineating the First Amendment considerations applicable to discovery of editorial judgment under *Sullivan.* Brief for Appellants at 7–8.

**15.** Appellees concede that the instant libel action is governed by *Sullivan.* Brief for appellee

tion, impermissibly burdens the work of reporters and broadcasters.[14]

## II

*New York Times v. Sullivan,* applying constitutional principles to the common law of libel, empowered a public figure to vindicate his reputation in an action if he could establish that the statements at issue were knowingly false, or made in reckless disregard of the truth. *New York Times v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. 710 (1964); *Curtis Publishing Co. v. Butts,* 388 U.S. 130 at 162–5, 170–2, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Gertz v. Robert Welch,* 418 U.S. 323, 335 n.6, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Goldwater v. Ginzburg,* 414 F.2d 324 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). Later decisions instructed that the *Sullivan* standard required a subjective inquiry into the defendant's state of mind. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).[15]

While *Sullivan* left a narrow area for public figures to maintain a libel action, limiting decisions have further refined *Sullivan* when viewed in the context of the First Amendment.[16] The opinions applying these additional constraints do so in recognition of the constitutional safeguards cloaking the press, and the need to protect editors and broadcasters. They speak with the same voice as do *CBS* and *Tornillo.*

at 16. Hence, the question which the Supreme Court has recently found so troublesome, the characterization of 'public figure' in libel suits, is not before us. See *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (*Sullivan* standard extended to private individual involved in event of public or general interest); but see *Gertz v. Robert Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (Chicago attorney engaged in prominent trial not deemed to be a public figure).

**16.** *Sullivan* has been further refined, substantively and procedurally. For example, where it is unlikely that the plaintiff will succeed on the merits of his claim, courts have been more willing, within the area of libel than elsewhere, to grant summary judgment. See, e. g., *Guitar v. Westinghouse Electric Corp.,* 396 F.Supp. 1042, 1053 fn.16 (S.D.N.Y.), and cases cited therein.

For example, in *Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977), we held that statements of opinion could not afford a basis for recovery in a libel case. The reason for this circumscription of libel was clear: the expression of personal opinions and views was fundamental to the need for vigorous debate. Indeed, it is part and parcel of the paramount function of the press—the dissemination of information. And, just last term, in *Edwards v. New York Times Co.*, 556 F.2d 113 (2d Cir. 1977), we held that a newspaper could not libel an individual when the reporter engaged in the neutral reportage of newsworthy material. Our concern there, too, was that the press be unhampered in bringing news to the public.[17]

These reciprocal developments in the law of libel and in freedom of the press narrowly define our task: we must permit only those procedures in libel actions which least conflict with the principle that debate on public issues should be robust and uninhibited. If we were to allow selective disclosure of how a journalist formulated his judgments on what to print or not to print, we would be condoning judicial review of the editor's thought processes. Such an inquiry, which on its face would be virtually boundless, endangers a constitutionally protected realm, and unquestionably puts a freeze on the free interchange of ideas within the newsroom. A reporter or editor, aware that his thoughts might have to be justified in a court of law, would often be discouraged and dissuaded from the creative verbal testing, probing, and discussion of hypotheses and alternatives which are the *sine qua non* of responsible journalism. Indeed, the *ratio decidendi* for *Sullivan's* restraints on libel suits is the concern that the exercise of editorial judgment would be chilled.

## III

With these principles set forth, we proceed to traverse the facts before us in some detail. In March 1971, Colonel Anthony Herbert achieved national importance when he formally charged his superior officers, Brigadier General John W. Barnes and Colonel J. Ross Franklin, with covering up war crimes in Vietnam. Herbert claimed, in documents filed with the U.S. Army Criminal Investigation Division (CID), that he had witnessed numerous atrocities while commanding a battalion of the 173rd Airborne Brigade. The most horrifying involved the murder of four prisoners of war by South Vietnamese police in the presence of an American advisor, who callously failed to intervene. Since those killings allegedly occurred on February 14, 1969, Herbert dubbed them the "St. Valentine's Day Massacre."

Herbert claimed to have reported all atrocities immediately to Colonel Franklin, deputy commander of the 173rd Airborne, at Brigade Headquarters in Vietnam, and to have brought several to the attention of the Brigade's commander, General Barnes. But, Herbert alleged, neither was interested in investigating the incidents. When Herbert persisted in pressing his charges, he said that he was abruptly relieved of his command, a determination that was subsequently affirmed by a military appeals tribunal. His removal as battalion commander was attributed to a poor efficiency report authored by Colonel Franklin, which accused Herbert of having "no ambition, integrity, loyalty or will for self-improvement."

Herbert's sudden fall from grace surprised many observers. His long career in the military had been exemplary, under his strong leadership, the second battalion had exhibited extraordinary prowess in battle. His military acumen had earned Herbert

---

**17.** In *Edwards*, we stated,

> We believe that the interest of a public figure in the purity of his reputation cannot be allowed to obstruct that vital pulse of ideas and intelligence on which an informed and self-governing people depend. It is unfortunate that the exercise of liberties so precious as freedom of speech and of the press may sometimes do harm that the state is powerless to recompense; but this is the price that must be paid for the blessings of a democratic way of life. *Id.* at 122.

one Silver and three Bronze stars, and he had recently been recommended to receive the Distinguished Service Cross.

Herbert's story fascinated an American public that was increasingly becoming disenchanted with the Vietnam War. In July 1971, he was interviewed by Life Magazine; that September, James Wooten of the New York Times wrote an article favorable to Herbert titled "How a Supersoldier Was Fired From His Command." Interviews with the television personality Dick Cavett followed which, according to Cavett, elicited a level of viewer response unmatched by any other single program. In October 1971, Congress became embroiled in the "Herbert affair" when Rep. F. Edward Heber, Chairman of the Armed Services Committee, convinced the Army to remove Herbert's poor efficiency report from his military record.

The Army also thoroughly investigated Herbert's charges of war crimes and, in October 1971, exonerated General Barnes. Armed with this new information, reporters began for the first time to critically examine the veracity of Herbert's story. During this period of intense public interest, Herbert announced his retirement from the service. He cited, as the reason for his decision, incessant harassment by the military because of his disclosures.

Barry Lando, an associated producer of the CBS Weekend News, was one of the many individuals interested in the Herbert story. He interviewed Herbert in June 1971 and later produced a laudatory report which was televised on July 4, 1971 over the CBS network. A year later, Lando had become a producer for CBS's documentary news program, "60 Minutes." He decided to investigate both Herbert's military career and his charges of cover-up for a comprehensive broadcast on the ensuing controversy. Lando interviewed not only Herbert, Franklin and Barnes, but questioned others, both in and out of the military, who could corroborate Herbert's claims that he had reported war crimes, and that the military had engaged in a systematic whitewash. Indeed, some of the leads which Lando pursued may have been supplied by

Herbert himself during their repeated and extensive conversations. Lando focused on particular allegations. He spent some time in attempting to assay whether Herbert had, in fact, reported the St. Valentine's Day Massacre to Franklin in Vietnam on February 14, 1969. Since Franklin protested that he was returning from Hawaii on that date, Lando concentrated on this point. Lando obtained Franklin's hotel bill and a cancelled check in payment of that bill, and interviewed others who could verify Franklin's activities on the crucial days. Lando also questioned Captain Bill Hill, upon whom Herbert relied to substantiate his story. When Hill recalled that Herbert reported war crimes to someone, he could not say with total certainty that Franklin was the individual.

Other allegations were also considered. Lando investigated Herbert's activities during the eighteen-month period between his relief from command and the filing of formal war crimes charges to determine whether Herbert had apprised other officers in Vietnam of his accusations. In particular, Lando interviewed the highest ranking military lawyer and judge in Vietnam at the time, Colonel John Douglass, who emphatically controverted Herbert's assertion that war crimes had been brought to his attention. Lando also elicited from Kenneth Rosenbloom, the military attorney and investigator who conducted the Army's inquiry into Herbert's allegations, the view that the military's handling of the charges was beyond reproach.

Lando also questioned soldiers who had served under Herbert to determine his qualities as commander. One of these, Sergeant Bruce Potter, reported occasions upon which Herbert had countenanced the commission of war crimes. Potter recounted, for example, an incident in which Herbert had thrown a sand bag out of a helicopter to frighten a war prisoner on the ground into thinking it was a fellow prisoner who had been ejected.

During this period, Lando received an uncorrected proof of "Soldier," a book written by Herbert in collaboration with James

Wooten of the New York Times. Although several of those interviewed by Lando attested to the verity of many of Herbert's reports, others did not. Thus, Herbert wrote that Captain James Grimshaw had once attempted to drive certain Viet Cong soldiers from a cave without injuring female civilians and children by valiantly entering their hiding place alone. Grimshaw, however, denied the incident had occurred.

Lando's research culminated in the telecast of "The Selling of Colonel Herbert" on February 4, 1973. That evening, the American people were presented with a fallen hero. The presentation on the air initially juxtaposed Herbert's claims and the denials of Franklin and Barnes that Herbert ever reported war crimes, and then considered in detail five aspects of the Herbert affair:

(1) Lando's doubts that Franklin was even present in Vietnam to hear of the St. Valentine's Day Massacre;

(2) Colonel Douglass's adamant denial that war crimes had been reported to him;

(3) Kenneth Rosenbloom's defense of the Army's investigation;

(4) Bruce Potter's recount of the helicopter incident; and

(5) James Grimshaw's flat contradiction of his alleged heroism in the cave.

While the existence of information corroborative of Herbert's claims was alluded to on the broadcast, the program as a whole clearly cast doubt upon all of Herbert's allegations. The telecast concluded with a plea that the Army make its records public to the end of conclusively settling the imbroglio.

Lando subsequently recounted his research in an Atlantic Monthly article titled "The Herbert Affair." The article, like the broadcast, cast serious doubts upon Herbert's veracity and concluded that the American press had been deluded by Herbert's story.

Herbert responded to the CBS broadcast and Lando's article by instituting a defamation action against CBS, Barry Lando, Mike Wallace, the correspondent for the program, and Atlantic magazine, alleging $44,725,000 in damages for injury to his reputation and impairment of his book "Soldier" as a literary property. Herbert contended that Lando deliberately distorted the record through selective investigation, "skillful" editing, and one-sided interviewing, and that he was deliberately depicted as evasive in the interview. In addition, Herbert claimed Atlantic republished Lando's statements knowing that they were false. Lando, Wallace and CBS countered that the publications represented a fair and accurate report of public proceedings, broadcast in good faith without malice, and, in addition, that the program and article were protected by the First and Fourteenth Amendments.

Once the issue was joined, Herbert commenced discovery of Lando, Wallace and CBS. The deposition of Lando required twenty-six sessions and lasted for over a year. The sheer volume of the transcript—2903 pages and 240 exhibits—is staggering. Lando answered innumerable questions about what he knew, or had seen; whom he interviewed; intimate details of his discussions with interviewees; and the form and frequency of his communications with sources.[18] The exhibits produced included transcripts of his interviews; volumes of reporters notes; videotapes of interviews; and a series of drafts of the "60 Minutes" telecast. Herbert also discovered the contents of pre-telecast conversations between Lando and Wallace as well as reactions to documents considered by both. In fact, our close examination of the twenty-six volumes of Lando's testimony reveals a degree of helpfulness and cooperation between the parties and counsel that is to be commended in a day when procedural skirmishing is the norm. Lando, however, balked when asked a small number of questions relating to his beliefs, opinions, intent and conclusions in

18. Much of Lando's testimony concerned the volumes of his notes which were produced. Lando painstakingly deciphered and explained the short, and often cryptic, remarks taken down during interviews. Lando's explanations frequently led to lengthy discussions regarding the subject matter of his discussions with third persons.

preparing the program.[19] He claimed that any response would be inconsistent with the protections afforded the editorial process by the First Amendment. These assertedly objectionable inquiries can be grouped into five categories:

1. Lando's conclusions during his research and investigations regarding people or leads to be pursued, or not to be pursued, in connection with the '60 Minutes' segment and the Atlantic Monthly article;

2. Lando's conclusions about facts imparted by interviewees and his state of mind with respect to the veracity of persons interviewed;

3. The basis for conclusions where Lando testified that he did reach a conclusion concerning the veracity of persons, information or events;

4. Conversations between Lando and Wallace about matter to be included or excluded from the broadcast publication; and

5. Lando's intentions as manifested by his decision to include or exclude certain material.

Faced with Lando's claim that the constitution immunized his mental process from discovery, Herbert sought an order, pursuant to Rule 37(a)(2) of the Federal Rules of Civil Procedure, compelling Lando to respond to his inquiries.[20] Judge Haight, after observing that the case was one of first impression, concluded that Herbert's discovery of the journalist's state of mind should be broad and unrestricted. He reasoned that a public figure bore a heavy burden of proving that an alleged libeler acted with actual malice or in reckless disregard of the truth, and that the necessarily subjective nature of the libel standard fully justified inquiry into Lando's thought processes.

Judge Haight dismissed Lando's contention that the machinations of the editorial mind were constitutionally sacrosanct and immune from the probing of a libel plaintiff.[21] The critical importance of the issue, whether the First Amendment erects any barriers to discovery of the editorial process, compelled this court to permit the instant interlocutory appeal, pursuant to 28 U.S.C. § 1292(b), of the district court's order that Lando answer Herbert's inquiries.

### IV

We have undertaken this extensive review of the facts to underscore that the

---

**19.** Here, too, counsel exhibited a remarkable degree of cooperation. In advance of Herbert's Rule 37 motion to compel discovery, Judge Haight suggested that the parties might voluntarily reach agreement concerning many of the objectionable questions. A substantial number of questions were withdrawn as a result, as were objections to a large number of others.

**20.** Rule 37(a) provides that

> A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling discovery . .

A motion under Rule 37(a) implements the provisions of Rule 26(b)(1):

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissable evidence.

Further, Rule 26(c) protects the party against whom discovery is sought by empowering the district court to issue a protective order to:

> protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ; . . . .

In compelling discovery, Judge Haight applied these rules but did not consider whether inquiry into editorial process would be oppressive or unduly burdensome.

**21.** Judge Haight concluded that *Sullivan* had already struck the balance between First Amendment rights and the protection of reputation. He argued that, since *Sullivan* allowed for a libel recovery upon a showing of actual malice or reckless disregard, all discovery leading to admissible evidence was proper. He dismissed out of hand appellants' contention that *Tornillo* and *CBS* mandated additional First Amendment protections:

> I find no substance in the argument defendants based upon the "editorial judgment" concept. . . . These cases (*CBS, Tornillo, Branzburg*) have nothing to do with the proper boundaries of pretrial discovery in a defamation suit alleging malicious prosecution.

lifeblood of the editorial process is human judgment. The journalist must constantly probe and investigate; he must formulate his views and, at every step, question his conclusions, tentative or otherwise. This is the process in which Barry Lando was engaged and his efforts suggest the nature and scope of the reporter's task in shaping and refining a mass of facts into a finished product.[22]

Herbert seeks to scrutinize this very process. Of course, he has already discovered what Lando knew, saw, said and wrote during his investigation. As we noted before, the deposition of Lando produced a massive transcript documenting in minute detail the course of Lando's research. The jury is free to infer from Lando's use and application of the extensive materials discovered and, equally important, from the failure to heed certain contradictory information. If it chooses to do so (and as we have indicated in footnote 22, we express no views on the merits of the controversy), it can find that Lando acted with actual malice or in reckless disregard of the truth.

Now, Herbert wishes to probe further and inquire into Lando's thoughts, opinions and conclusions. The answers he seeks strike to the heart of the vital human component of the editorial process. Faced with the possibility of such an inquisition, reporters and journalists would be reluctant to express their doubts. Indeed, they would be chilled in the very process of thought. As we expressed above, the tendency would be to follow the safe course of avoiding contention and controversy—the antithesis of the values fostered by the First Amendment.

We cannot permit inquiry into Lando's thoughts, opinions and conclusions to consume the very values which the *Sullivan* landmark decision sought to safeguard.[23] It cannot be gainsaid that were a legislative body to require a journalist to justify his decisions in this matter, such an intrusion would not be condoned. That this invasion on First Amendment rights is about to be effected by an allegedly libelled plaintiff does not reduce the grave implications for the vitality of the editorial process which the Supreme Court and this court have recognized must be guarded zealously. It makes little sense to afford protection with one hand and take it away with the other. Accordingly, we remand to the district court for an evaluation of the interrogatories in light of the principles articulated in this opinion.

OAKES, Circuit Judge (concurring):

I concur with much of Chief Judge Kaufman's opinion, his broad answer to the certified question and the overall judgment. Because this case breaks new ground in an area of utmost importance, it warrants setting forth the somewhat different First Amendment analysis I use to reach the ultimate result, even at the risk of some repetition. In the process I will also set forth my own slightly more detailed views on the approach that should be taken by the district court on remand, for whatever guidance they may supply.

I

As we know, in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court "constitutionalized" the law of defamation by subjecting it to requirements deriving from and implicit in the First Amendment.[1]

---

**22.** In so characterizing Lando's research, we do not mean to express any view as to the merits of the controversy.

**23.** Selective inquiry into the reporter's thoughts can be far worse than the discovery of all aspects of his mental process. In plumbing only particular facets of the reporter's mind, the libel plaintiff is more likely to distort the nature of the editorial process.

**1.** *See Restatement (Second) of Torts*, Special Note at 3 (Tent. Draft No. 21, 1975); Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va.L.Rev. 1349, 1364–1408 (1975); Robertson, *Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc.*, 54 Tex.L.Rev. 199, 199 (1976). For an early explication of the change of the tort law of defamation into a subject of constitu-

In cases involving publication of matter pertaining to public affairs and involving public officials—as this case does [2]—to be liable a defendant must have acted with "actual malice" [3] as constitutionally defined. *Sullivan* contemplates not only that the alleged defamatory statements are false but that the libel defendant knew that they were false or made them with reckless disregard of their truth or falsity. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *New York Times Co. v. Sullivan, supra*, 376 U.S. at 279–80, 84 S.Ct. 710. The appropriate standard is whether "the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). In this respect, ill will toward the plaintiff, bad motive, hatred, spite or even desire to injure—malice in the traditional as opposed to the constitutional sense—is not involved. *See Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 281, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Buckley v. Littell*, 539 F.2d 882, 889 (2d Cir. 1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977).

This case presents the broad question whether in a case involving allegations of actual malice discovery should be "liberal" as provided generally by the Federal Rules of Civil Procedure [4] and as held by the trial judge, or should be restricted in certain ways. The restriction urged on us specifically is that matters of "editorial process" [5] should not be discoverable at all or only under certain limitations. The exact relief requested remains somewhat unclear since appellant's brief would have us remand to the district court "with instructions for that Court to redetermine the issues raised by the motions [pursuant to Rule 37 of the Federal Rules of Civil Procedure], giving due regard to First Amendment considerations as set forth by this Court." Brief for Appellant at 8, 32–33. Within these broad parameters we are invited in this extraordinary though not unique interlocutory appeal on a discovery order,[6] to set some limits in *Sullivan* cases on the untrammeled, roving discovery that has become so prevalent in other types of litigation in today's legal world. Not without the doubt that any venture on untrod paths may bring, I am willing to join in accepting the invitation.

tional dimension, see Kalven, *The New York Times Case: A Note on "the Central Meaning of the First Amendment,"* 1964 Sup.Ct.Rev. 191.

2. It involves the conduct of the Vietnam war, a public issue, *New York Times Co. v. United States*, 403 U.S. 713, 724, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Douglas, J., concurring), and a United States Army officer who was a public official and employee, who by his charges against the military establishment unquestionably made himself a public figure, thereby inviting "attention and comments." *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Buckley v. Littell*, 539 F.2d 882, 885–86 (2d Cir. 1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977).

3. The phrase "actual malice" is a "term of art" that evidently is now "studiously avoided" by the Supreme Court. *See* Eaton, *supra* note 1, at 1370 n.87. However, it is a shorthand phrase for *Sullivan*'s "knowing falsity or reckless disregard of truth" test. It is used here in its accurate sense.

4. Fed.R.Civ.P. 26(b)(1).

5. While the area for which appellant seeks protection, "editorial process," may initially seem vague, guidance is provided by Chief Justice Burger's statements in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), and in *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 124–25, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). *See* text accompanying note 37 *infra*. The specific areas of inquiry sought by the plaintiff are set out in Chief Judge Kaufman's opinion, *ante* at 983.

6. *See Socialist Workers Party v. Attorney General*, 565 F.2d 19 (2d Cir. 1977) (no interlocutory review of discovery order absent certification, "manifest abuse of discretion," or legal question of "extraordinary significance"); *cf. Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir.) (interlocutory review of a denial of summary judgment appealable because of critically important First Amendment issue), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969).

At the outset, there are familiar landmarks. There is, for example, no necessary internal inconsistency between a First Amendment limitation on compelled discovery in *Sullivan* cases on the one hand and liberal rules of civil procedure on the other.[7] The rules of civil procedure expressly contemplate limitations in at least two areas. First, where discovery would result in "oppression" of or "undue burden" on a person whose deposition is being taken, a court may limit or even forbid discovery.[8] Certainly, therefore, a plaintiff's attempt to prove actual malice may be restrained where the discovery he seeks satisfies the oppression standard of Rule 26(c). And second, Rule 26(b)(1) excepts privileged matters from compelled discovery.[9] Not surprisingly, a privilege insulating journalists' confidential sources from compelled discovery in civil litigation has been recognized by this court and others. *Baker v. F & F Investment*, 470 F.2d 778 (2d Cir. 1972) (civil rights litigation), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972) (public figure libel litigation), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); *see Apicella v. McNeil Laboratories, Inc.*, 66 F.R.D. 78 (E.D.N.Y.1975); *Loadholtz v. Fields*, 389 F.Supp. 1299 (M.D.Fla.1975). *But see Dow Jones & Co. v. Superior Court*, 364 Mass. 317, 303 N.E.2d 847 (1973). The limitation on discovery of journalists' sources suggests by analogy that other First Amendment limitations on discovery in *Sullivan* cases may be similarly appropriate. The focus of inquiry thus becomes whether the First Amendment protects matters which constitute the editorial process from compelled discovery and, if so, the extent of that protection.

## II

I agree with the Chief Judge that compelled discovery of the editorial selection process implicates the First Amendment. I arrive at this position not on First Amendment grounds generally but in light of what seems to be the Supreme Court's evolving recognition of the special status of the press[10] in our governmental system and the concomitant special recognition of the Free Press clause of the First Amendment. Mr. Justice Stewart, in a seminal speech at the Yale Law School, has characterized this trend as a structural, institutional differentiation between freedom of speech and freedom of press.[11] The trend has found expression that is both developmental and fundamental in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). There the Court established an area of protection of the *press* against "intrusion into the function of editors." *Id.* at 258, 94 S.Ct. at 2839. The Court held unconstitutional a Florida statute requiring newspapers to print the replies of political candidates who had been editorially attacked. Chief Justice Burger's opinion for a unanimous Court explained that "governmental regulation" of the "crucial process" of "editorial control and judgment" cannot be exercised consistently with evolving First Amendment guarantees of a free press. *Id.*[12] *Tornillo* expressly adopt-

7. I do not mean to suggest that Judge Haight in his scholarly opinion below relied simply on the discovery rules.

8. Fed.R.Civ.P. 26(c); *cf. Branzburg v. Hayes*, 408 U.S. 665, 707–08, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (grand jury harassment of press impermissible).

9. Fed.R.Civ.P. 26(b)(1).

10. That the broadcast media are "press" is reasonably well established. *E. g., Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496–97, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 394, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

11. Stewart, *"Or of the Press,"* 26 Hastings L.J. 631, 633 (1975); *see* text accompanying notes 16–17 *infra*.

12. Concurring, Mr. Justice White noted: Regardless of how beneficient-sounding the purposes of controlling the press might be, we prefer "the power of reason as applied through public discussion" and remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press.

ed some of the premises and many of the implications of *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). *Columbia Broadcasting* had emphasized the First Amendment right of broadcasters to make independent editorial programming decisions. In holding that neither the Communications Act nor the First Amendment requires broadcasters to accept paid editorial advertisements, Chief Justice Burger stated:

> For better or worse, editing is what editors are for; and editing is selection and choice of material. That editors—newspaper or broadcast—can and do abuse this power is beyond doubt, but . . .

*Miami Herald Publishing Co. v. Tornillo, supra,* 418 U.S. at 259, 94 S.Ct. at 2840 (White, J., concurring) (footnote omitted). *But see Red Lion Broadcasting Co. v. FCC, supra,* 395 U.S. at 385–86, 89 S.Ct. 1794, holding that political editorializing by radio broadcasters is subject to the "fairness doctrine" under the Federal Communications Act. As to the right of access guaranteed by *Red Lion,* see F. Friendly, *The Good Guys, The Bad Guys and the First Amendment: Free Speech vs. Fairness in Broadcasting* (1976). *Compare* B. Schmidt, *Freedom of the Press vs. Public Access* (1976), *with* Abrams, *In Defense of* Tornillo, 86 Yale L.J. 361 (1976) (book review).

The *Red Lion* opinion, as well as the Act of Congress on which it is based, have been increasingly criticized for failing to consider the institutional aspects of the press. *E. g.,* Note, *Press Protections for Broadcasters: The Radio Format Change Cases Revisited,* 52 N.Y.U.L. Rev. 324, 339 (1977) [hereinafter Note, *Press Protections*]. The criticism suggests that the opinion and Act fail to take into account the distinction between the Speech and Press clauses. As Chief Judge Bazelon has noted:

> If one group has a right of access or a right to have the licensee present that group's point of view, there is no independent press; there is only a multitude of speakers. That might be permissible if the First Amendment protected only free speech. However, it also protects the press.

Bazelon, *FCC Regulation of the Telecommunications Press,* 1975 Duke L.J. 213, 235 (footnote omitted); *see* Note, *Press Protections, supra* at 339 n. 102.

It has been asserted that historically there was no differentiation between Speech and Press guarantees. L. Levy, *Legacy of Suppression: Freedom of Speech and Press in Early American History* 173–74 (1960); Lange, *The Speech and Press Clauses,* 23 U.C.L.A.L.Rev. 77, 88–99 (1975); Note, *Press Protections, supra* at 342. But the High Court arguably has established the differentiation by now, whether or not it was the "original position." *Compare* Stewart, *supra* note 11, at 631–37, and Nimmer, *Introduction—Is Freedom of the Press a Redundancy: What Does It Add to Freedom of Speech?,* 26 Hastings L.J. 639, 645–50 (1975), *with* Lange, *supra* at 77 *Passim.*

13. *Sullivan* itself recognizes limitations on the courts imposed by the First Amendment. So, too, does *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (judicially imposed gag order violates First Amendment rights of the press).

14. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 391, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973). There the Court, in upholding the constitutional validity of an ordinance prohibiting sex-based help-wanted advertisements, emphasized:

> [N]othing in our holding allows government at any level to forbid Pittsburgh Press to publish and distribute advertisements commenting on the Ordinance, the enforcement practices of the Commission, or the propriety of sex preference in employment. Nor, *a fortiori,* does our decision authorize any restriction whatever, whether of content or layout, on stories or commentary originated by Pittsburgh Press, its columnists, or its contributors. On the contrary, we reaffirm unequivocally the protection afforded to editorial judgment and to the free expression of views on these and other issues, however controversial.

[c]alculated risks of abuse are taken in order to preserve higher values.

*Id.* at 124–25, 93 S.Ct. at 2097.

"Governmental regulation" surely includes judicial as well as legislative regulation; the First Amendment binds the courts just as it binds the other branches of government.[13] *Tornillo* and *Columbia Broadcasting* thus suggest and support, if they do not compel, the proposition that the First Amendment will not tolerate intrusion into the decision-making function of editors,[14] be it legislative or judicial action.

The district court declined to apply the editorial process concept simply on the basis that *Tornillo* and *Columbia Broadcasting* had "nothing to do" with the proper bound-

aries of discovery in a libel case. *Herbert v. Lando*, 73 F.R.D. 387, 396 (SDNY 1977). While this notion may be appealing initially, the principle enunciated in these cases—that the editorial process of the *press* is entitled to special protection—has, I think, not just pertinent, but altogether controlling ramifications.[15] As Mr. Justice Stewart has pointed out, "the Free Press guarantee is, in essence, a *structural* provision of the Constitution."[16] He continues:

> Most of the other provisions in the Bill of Rights protect specific liberties or specific rights of individuals: freedom of speech, freedom of worship, the right to counsel, the privilege against compulsory self-incrimination, to name a few. In contrast, the Free Press Clause extends protection to an institution. The publishing business is, in short, the only organized private business that is given explicit constitutional protection.
>
> This basic understanding is essential, I think, to avoid an elementary error of constitutional law. It is tempting to suggest that freedom of the press means only that newspaper publishers are guaranteed freedom of expression. They *are* guaranteed that freedom, to be sure, but so are we all, because of the Free Speech Clause. If the Free Press guarantee meant no more than freedom of expression, it would be a constitutional redundancy . . . .
>
> It is also a mistake to suppose that the only purpose of the constitutional guarantee of a free press is to insure that a newspaper will serve as a neutral forum for debate, a "marketplace for ideas," a

kind of Hyde Park corner for the community. A related theory sees the press as a neutral conduit of information between the people and their elected leaders. These theories, in my view, again give insufficient weight to the institutional autonomy of the press that it was the purpose of the Constitution to guarantee

. . . .

> The primary purpose of the constitutional guarantee of a free press was . . . to create a fourth institution outside the Government as an additional check on the three official branches.

Stewart, "*Or of the Press*," 26 Hastings L.J. 631, 633–34 (1975) (emphasis in original).

The structural or institutional aspect of the Free Press guarantee is not, as Justice Stewart points out, some filigree added at the final stages of design by the architects of the Constitution. Rather it is at the core of the construct, vital to the tensile integrity of our government. *See New York Times Co. v. United States*, 403 U.S. 713, 717, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Black, J., concurring); *United States v. National Committee for Impeachment*, 469 F.2d 1135, 1142 (2d Cir. 1972). To the extent that the independent exercise of editorial functions is threatened by governmental action, the very foundations of the architectural masterpiece that is our form of government are shaken, the supporting columns weakened.[17]

*Tornillo* and *Columbia Broadcasting* recognize the inviolability of the editorial function. As such they reflect a keen judicial

---

**15.** Government intrusion into editorial functions may result from compelled disclosure of editorial conclusions, opinions and intentions. To be sure, *Tornillo* and *Columbia Broadcasting* do not specifically deal with First Amendment limitations on discovery. But they give concrete form to the structural concept of press freedom in the editorial selection process which would otherwise be subjected to stress, if not internally weakened to the point of non-repair, by the probing drill of unrestrained discovery.

**16.** Stewart, *supra* note 11, at 633–34.

**17.** *But see Carey v. Hume*, 160 U.S.App.D.C. 365, 373–74, 492 F.2d 631, 639–40 (1974)

(MacKinnon, J., concurring) (immense power of modern media requires that reporter divulge sources in civil libel suit), *cert. dismissed*, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974). The power that Judge MacKinnon (and an advocate of the Florida access statute in *Tornillo*) fears may, however, be dealt with in other ways. The FCC has, for example, won court approval to bar newspaper ownership of broadcast/television media in a single locale in the future. *See National Citizens Comm. for Broadcasting v. FCC*, 181 U.S.App.D.C. 1, 555 F.2d 938 (1977), *cert. granted*, —— U.S. ——, 98 S.Ct. 52, 54 L.Ed.2d 70 (1977).

recognition of the role of the press in American society and its need for protection, a trend that has been evidenced by practically solid judicial response in favor of protection.

The doctrine of prior restraint, prohibiting government from censoring publications in advance, is of the highest constitutional magnitude.[18] This presumption [19] against the constitutional validity of prior restraints is particularly strong when the intrusion affects the communication of news or commentary on current events. *See Nebraska Press Association v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 717, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

Further solidifying judicial recognition of the compelling institutional need for an independent press, again in a test that has been nothing less than momentous, is the decision that notwithstanding the Sixth Amendment guarantee to a fair trial by an impartial jury, judicial restraints on the publication of information concerning criminal trials will be tolerated only when less drastic methods of avoiding the effects of pretrial publicity are useless.[20] *Nebraska*

**18.** Prior restraints have generally been condemned as the most egregious violations of press freedom. *E. g., Nebraska Press Ass'n v. Stuart, supra*, 427 U.S. at 559, 96 S.Ct. at 2803 ("A prior restraint . . . has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time.") (footnote omitted); *See Times Film Corp. v. City of Chicago*, 365 U.S. 43, 53, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961) (Warren, C. J., dissenting). The precise parameters of the prior restraint doctrine have never been delineated. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), expanded the classic English definition of prohibiting publication without advance approval of the government to preclude an injunction against publication of malicious and scandalous matter enforced by a *subsequent* contempt order. The later threat of an injunction was viewed as a prior restraint; while the metaphor of "chilling effect" had not yet been devised it was already operational. The broad scope of the doctrine is apparent from the holding in *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), where a tax imposed on newspapers publishing advertisements and measured by the amount of circulation was found to be an unconstitutional prior restraint because the tax lowered advertising revenues and restricted circulation. *Id.* at 244–45, 56 S.Ct. 444. Justice Sutherland explained the scope of the prior restraint doctrine as enunciated in *Near*:

> The conclusion there stated is that the object of the constitutional provisions was to prevent previous restraints on publication; and the court was careful not to limit the protection of the right to any particular way of abridging it. . . .
>
> Judge Cooley has laid down the test to be applied—"The evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general dis-

cussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." 2 Cooley's Constitutional Limitations, 8th ed., p. 886.

*Id.* at 249–50, 56 S.Ct. at 449.

The broad discovery order in this case operates *after* publication to deter free editorial choice concerning *subsequent* publications. Because the order operates as a prior restraint, as did the tax in *Grosjean*, it should be presumed invalid. *See* T. Emerson, *The System of Freedom of Expression* 503–12 (1970). Furthermore, the order impinges on the most sensitive functions of the press, the motivations behind and thought processes involved in editorial decisions; thus, the presumption should be given all the more force. The prior restraint cases, as well as *Tornillo* and *Columbia Broadcasting*, appear to be directed against the danger of self-censorship by the press arising from concern with subsequent executive, legislative or judicial scrutiny. It is the protection these cases afford that truly gives rise to the concept of the press as a Fourth Estate, coequal in our democratic republic in constitutional respect, even though not incorporated formally into our governmental system as a structuralized entity.

**19.** *New York Times Co. v. United States, supra*, 403 U.S. at 714, 91 S.Ct. 2140; *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

**20.** Another example of increasing judicial recognition of the fundamentality of the Press guarantee is the newly perceived status of commercial speech. *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Linmark Assocs., Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346

*Press Association v. Stuart, supra,* 427 U.S. at 562, 96 S.Ct. 2791. The Freedom of Press guarantee against governmental intrusions on the editorial process is surely at least as strong when, as here, other constitutional rights are not at stake.

In short, the principles underlying the access and prior restraint cases apply in this situation even though the government is neither ordering the content of a publication nor directly restraining publication. The critical question is whether government is impermissibly impeding the editorial function of the press; the time [21] at which this intrusion occurs should not—it cannot —matter.[22] Because broad discovery orders compelling disclosure of the editorial selection process can result in a chilling of "the free interchange of ideas within the news room," *ante* at 980, the "crucial process" of "editorial control and judgment" protected by the Freedom of Press clause. *Miami Herald Publishing Co. v. Tornillo, supra,* 418 U.S. at 258, 94 S.Ct. 2831, is in as much jeopardy as if the court had restrained publication *ab initio.* For self-censorship in the

future resulting from the prior judicial order is a foreseeable, perhaps a likely, result. "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973). This is a concern directed at the "institutional viability" of the press. *Id.* at 382, 93 S.Ct. 2553. Uninhibited discovery into the motivations of the editor in a libel action poses precisely the danger sought to be avoided by the landmark cases which have established the prior restraint doctrine as hornbook constitutional law. Accordingly, the principles underlying the doctrine necessitate the application of the Free Press guarantee to protect the independence of the press against such discovery.

This is by no means the first instance in which First Amendment considerations

(1976); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). The *Sullivan* doctrine itself, subjecting the common law of libel to First Amendment limitations, while addressed to expression generally, *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), also reflects a pervasive Supreme Court awareness of the arterial flow to our system of democracy given through the channels of a free press. The *Sullivan* doctrine was, after all, enunciated in a suit against a newspaper. The opinion of the Court drew extensively on the history of the discredited Alien and Sedition Acts, *id.* at 273–77, emphasizing Madison's Report to the effect that "the press has exerted a freedom in canvassing the merits and measures of public men, of every description, which has not been confined to the strict limits of the common law." *Id.* at 275 (quoting 4 Elliot's Debates on the Federal Constitution 570 (1876)). Mr. Justice Goldberg, concurring, advocated unconditional First Amendment protection to criticize official conduct. *Id.* at 298. He, too, relied heavily on the need for robust debate to ensure a stable, responsive democratic government. *See id.* at 300. *See generally* 1 N. Dorsen, P. Bender & B. Neuborne, *Emerson, Haber & Dorsen's Political and Civil Rights in the United States* 20–51 (4th ed. 1976) [hereinafter 1 N. Dorsen], for an historical analysis of the First Amendment.

21. The phrase "prior restraint" obviously no longer connotes a strict temporal meaning. Supreme Court cases indicate, *see* note 18 *supra,* that meddling with press freedoms after the printing or programming has occurred operates as a "prior restraint" on future editorial decisions by virtue if the chilling effect created by that interference. *See* T. Emerson, *supra* note 18, at 511.

22. It has often been acknowledged that trivial distinctions between types of governmental intrusion will not be relied upon when the effects impinge the Free Press guarantee.

   In rejecting the argument that there is a meaningful difference between government restricting the content of press communications and compelling the press to publish what "reason tells them should not be published," the Court in *Tornillo* noted that "[g]overnmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers." 418 U.S. at 256, 94 S.Ct. at 2839. *See Baker v. F & F Investment,* 470 F.2d 778, 785 (2d Cir. 1972) (Kaufman J.), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973).

have dictated special procedural rules.[23] It is not even the first situation in which a court has held that the First Amendment extends protection in a libel case beyond the standards for liability established in *Sullivan* in order to prevent undue chilling from the litigation process itself.[24]

By recognizing that *Tornillo* and *Columbia Broadcasting* require a constriction of the normal discovery rules to protect the editorial selection process of the press from compelled scrutiny, we simply add an additional procedural rule in the interest of ensuring an independent, institutional freedom of the press.[25] Only the level of protection remains to be determined.[26]

**23.** *See, e. g., Broadrick v. Oklahoma*, 413 U.S. 601, 611–14, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (relaxed standing rules to challenge statutes allegedly violative of the First Amendment); *Baker v. F & F Investment, supra,* 470 F.2d at 783 (rejecting disclosure of journalists' sources in civil rights case except under limited circumstances).

**24.** Indeed, in *Sullivan* the Court qualified those standards by the self-imposed procedural limitation that it would make an independent examination of the entire record. *New York Times Co. v. Sullivan, supra,* 376 U.S. at 285 & n.26, 84 S.Ct. 710, *see Time, Inc. v. Pape,* 401 U.S. 279, 284, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Buckley v. Littell, supra,* 539 F.2d at 888. A number of courts taking a normally cautious attitude toward summary judgment have been somewhat more relaxed in constitutional libel cases. *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. 32, 34–35, 365 F.2d 965, 967–68 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); *see* 1 N. Dorsen, *supra* note 21, at 693–95. To prevail, moreover, again as established by *Sullivan* itself, a plaintiff's evidence must be of "convincing clarity," rather than a mere preponderance. *New York Times Co. v. Sullivan, supra,* 376 U.S. at 285–86, 84 S.Ct. 710, *see Wasserman v. Time, Inc.,* 138 U.S.App.D.C. 7, 9, 424 F.2d 920, 922 (Wright, J., concurring), *cert. denied,* 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970); Freund, *William J. Brennan, Jr.,* 86 Yale L.J. 1015, 1016 (1977). First Amendment considerations have been held to lead more readily to a finding of *forum non conveniens, Buckley v. New York Post Corp.,* 373 F.2d 175, 183–84 (2d Cir. 1967), and lack of jurisdiction, *New York Times Co. v. Connor,* 365 F.2d 567, 570–73 (5th Cir. 1966).

**25.** To the extent that this conclusion creates an inconsistency between judicial treatment of the press on the one hand and non-press defendants on the other, the inconsistency may be said to rest upon the non-redundant nature of the Freedom of Press guarantee. *See* note 12 *supra.* *But see Restatement (Second) of Torts* § 580B, Comment d at 29–30 (Tent. Draft No. 21, 1975), discussing the scope of *Gertz v. Robert Welch, Inc., supra* :

The defendant in the *Gertz* case was the publisher of a magazine. The Court speaks frequently of "news media" and "communi-

cations media" and states the rule in terms of a "publisher or broadcaster." The precise holding of the case therfore, [sic] does not extend beyond a statement published by a member of the communications media; and the constitutional requirement of fault on the part of the defendant may turn out to be limited to this holding, though this seems unlikely.

Of course, there would be no inconsistency if the *Sullivan* rule were abandoned in favor of non-liability to public figure plaintiffs.

**26.** From its inception the *Sullivan* rule, as a matter of substantive law, has not been spared of criticism. Justices Black, Douglas and Goldberg thought the actual malice test constitutionally deficient for inquiring in the first place into the editor's state of mind. As Mr. Justice Black explained:

"Malice," even as defined by the Court, is an elusive, abstract concept, hard to prove and hard to disprove. The requirement that malice be proved provides at best an evanescent protection for the right critically to discuss public affairs . . . . .

376 U.S. at 293, 84 S.Ct. at 733 (Black, J., concurring). Mr. Justice Goldberg elaborated further by noting that the right to criticize official misconduct, " 'to speak one's mind' . . . about public officials and affairs . . should not depend upon a probing by the jury of the motivation of the citizen or press." *Id.* at 298, 84 S.Ct. at 735 (Goldberg, J., concurring) (citations and footnote omitted). And in his footnote two, Mr. Justice Goldberg quoted from Mr. Justice Jackson's dissent in *United States v. Ballard,* 322 U.S. 78, 92–93, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), that it is difficult to separate, practically or philosophically, "what is believed" from "what is believable." 376 U.S. at 298–99 n.2, 84 S.Ct. 710. (Goldberg, J., concurring). Professor Emerson has written that the actual malice rule is

subject to the very same defects that led the majority of the [*Sullivan* ] Court to reject broader tests of liability[,] . . . leaves the speaker with roughly the same degree of risk as the earlier rules of negligence and engenders approximately the same amount of self-censorship . . . [and] imposes . . . an impossible problem of judicial administration.

T. Emerson, *supra* note 18, at 535–36.

## III

In selecting the appropriate level of protection for the editorial process, we are faced with three theoretical possibilities. First, we might conclude as did the lower court that *Sullivan* has struck the ultimate appropriate balance so that the libel plaintiff must be permitted a level of discovery coterminous with the substantive law of constitutional libel. If so, then the plaintiff would be permitted to inquire into every aspect of the defendant's state of mind at the discovery stage with little or no inhibition. Second, we might decide that while *Sullivan* has generally struck the substantive balance, it does not preclude restraint on compelled discovery, specifically where First Amendment values are unnecessarily threatened by the nonconstitutional interest in liberal discovery. We could adapt the test developed in the disclosure of confidential source cases: evidence of the editorial process is discoverable only when it is *direct* evidence of a *highly* relevant matter which cannot otherwise be obtained.[27] And finally, we might opt for the conclusion that the editorial process, is subject to constitutional privilege and that actual malice must be proved by evidence other than that obtained through compelled disclosure of matters at the heart of the editorial process.

The answer is not free of doubt. Strict logic leading to the selection of option one has surface appeal. Approach number two seems like a reasonable compromise at first blush. But in the delicate area of precious First Amendment liberty, *see Baker v. F & F Investment, supra,* 470 F.2d at 785, a subtly discerning eye is necessary. Hard cases make for hard choices; vision must not only be acute, it must also be peripheral.

The argument of strict logic—that the *Sullivan* test of knowing-or-reckless-falsity assumes open-ended discovery for the purpose of proving actual malice—is deficient in several respects. First, the *Sullivan* Court in no way indicates that it is doing anything more than setting forth substantive rules. It does not deal with the method of proving actual malice.[28] Actual malice can be proved in a number of ways. Logical inferences from the inconsistency, say, between a television program's content and contrary facts which a plaintiff might independently establish would provide an obvious starting point for such proof.[29]

Professor Emerson also attacks the *Sullivan* majority's rationale, set forth in *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), that calculated falsehood is no essential part of any exposition of ideas as inconsistent with the concept of *Sullivan* itself. *See* T. Emerson, *supra,* at 536. But even inferior federal courts know that upon occasion judicial opinions may involve compromises in expression to reach a result in fact; here there was at least a procedural accommodation, note 24 *supra.*

However persuasive these arguments might be if we were writing on a clean slate, as an inferior court we are of course bound to follow the rule of *Sullivan.* Thus the editor's state of mind, not vis-à-vis the plaintiff, but vis-à-vis the truth or falsity of what is being published about the plaintiff, is a proper focus of inquiry.

27. *See* note 36 and accompanying text *infra.*

28. Appellee argues that *Tornillo* and *Columbia Broadcasting* have not affected media liability under *Sullivan* and its progeny, relying on the Court's reaffirmation of the *Sullivan* liability standard in *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 342, 94 S.Ct. 2997, decided on the same day as *Tornillo.* Brief for Appellee at 29

& n.*. This argument, however, overlooks the distinction between standards of liability and the means of proving liability under the appropriate standard. *Tornillo* and *Columbia Broadcasting* have not altered the substantive law of libel established in *Sullivan.* They articulate broad First Amendment protection of editorial process decisions. The issue, then, is simply whether and to what extent this protection encompasses compulsory disclosure of the mental processes of editors. The free press principles of these cases are being applied to limit a procedural rule, not to alter the substantive law of libel.

29. A case in our court goes further perhaps than any other in permitting proof of bad motive directed toward the plaintiff to show the reckless disregard of truth that the actual malice test of *Sullivan* requires. *See Goldwater v. Ginzburg,* 414 F.2d 324, 342 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970) ("evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity"). *Goldwater,* however, was not concerned with the

Moreover, a plaintiff might adduce circumstantial evidence from participants or interviewees on the television program. In this case, for example, documents furnished under the Freedom of Information Act indicate that Lando's state of mind may be provable without directly impinging on the editorial process.[30] While I offer no opinion on the admissibility or adequacy of this evidence to prove actual malice, it is clear that an editor's state of mind can be examined without discovering facts at the heart of the editorial process. Limiting discovery to those matters and persons not at the heart of the editorial process does not transform the *Sullivan* rule into a nullity for putatively libeled public figures. They *can* prove actual malice without endangering the editorial process which *Tornillo* held to be protected by the First Amendment.[31]

Second, the *Sullivan* balance, by permitting plaintiffs the opportunity to prove actual malice, deems a certain level of chilling-effect fallout to be consistent with the First Amendment.[32] However, permitting compelled discovery of the editorial process would indubitably increase the level of chilling effect in a way ostensibly not contemplated by *Sullivan.* Thus, it is one thing to tell the press that its end product is subject to the actual malice standard and that a plaintiff is entitled to prove actual malice; it is quite another to say that the editorial process which produced the end product in question is itself discoverable. Such an inquiry chills not simply the material published but the relationship among editors. Ideas expressed in conversations, memoranda, handwritten notes and the like, if discoverable, would in the future "likely"[33] lead to a more muted, less vigorous

boundaries of plaintiff's discovery into the editorial process but rather dealt principally with the sufficiency of the evidence adduced and the correctness of the judges, charge to the jury on the appropriate standard of substantive law.

30. The documents, prepared by Lieutenant Colonel F. B. Reed, Jr., indicate that in anticipation of the broadcast Lando told Colonel Reed that "Lando's stated premise is that Herbert is a liar and he has stated that if he can't develop a sufficient number of incidents in which Herbert's account can not [sic] be debunked, then there will be no story." Brief for Appellee at 56 (Exhibit I). On December 4, 1972, Lando interviewed Colonel J. Ross Franklin. During the interview, at which Reed was present, Lando "persist[ed] in [his] contention that he is interested in debunking Herbert. . . . After the interview he informed me that Mike Wallace has agreed to do the narration and is equally convinced that the story is in debunking Herbert. Lando asserts that he has [the] final decision on the segment and it will not go unless he can convincingly portray Herbert as the bad guy." *Id.* at 57 (Exhibit II). The third *document reveals that on December 20, 1972,* Lando in a meeting with Major General Sidle "indicated that his peice [sic] is aimed at debunking Herbert in his long fight against the Army. *Further Lando indicated that he would* focus some attention on the failure of the media to check out Herbert's story prior to 'puffing him up'. [Sic.] He plans to focus on four or five events whcih [sic] are *contained in Herberts* [sic] book and factually destroy Herbert's credibility." *Id.* at 58 (Exhibit III).

31. Limiting plaintiff's discovery concededly may deprive him of adducing the best proof of

malice in the common law sense of ill will toward the plaintiff. But *Sullivan* itself distinguishes common law malice from actual malice. Limiting proof of actual malice as defined in *Sullivan* resembles other rules of evidence which limit the "search for truth" in the interests of a higher social policy. *See, e. g.,* Fed.R. Evid. 407, precluding introduction of subsequent remedial measures to prove negligence in order to encourage the promotion of safety.

32. *Hotchner v. Castillo-Puche,* 551 F.2d 910 (2d Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977), provides an excellent example of the inhibiting effect that *Sullivan* may exercise on First Amendment freedoms. In *Hotchner,* the defendant had written a biography of Ernest Hemingway with uncomplimentary references to the plaintiff, a public figure. Prior to publication the editor, pursuant to recommendations of the legal department of Doubleday & Co., Inc., suggested that a number of passages "be eliminated or toned down." *Id.* at 912. Even though the author "vouched for the statements" in his manuscript, he "accepted the suggested modification." *Id.* The self-censorship was nonetheless imposed despite the fact that it may have been unnecessary in view of the court's subsequent conclusion that "[w]here a passage is incapable of independent verification, and where there are no convincing indicia of unreliability, publication of the passage cannot constitute reckless disregard for truth." *Id.* at 914.

33. *See Lamont v. Postmaster General,* 381 U.S. 301, 307, 85 S.Ct. 1493, 1496, 14 L.Ed.2d 398 (1965) (postal regulation that those wishing to

and creative give-and-take in the editorial room. This incremental chilling effect exceeds the level of chilling effect contemplated by the *Sullivan* balance.

Finally, the fatal flaw of the strict logic position is its failure even to consider *Tornillo*'s and *Columbia Broadcasting*'s ramifications. It ignores the special status which the Free Press guarantee accords to the editorial process.[34]

The compromise position is similarly defective. While taking account of *Tornillo*'s mandates, it falls short of the protection required by *Sullivan* and *Tornillo*. Admittedly, the compromise test accounts for the argument advanced above that evidence of actual malice is obtainable from sources other than compelled discovery of editors' state of mind because the compromise test itself requires that the evidence be not otherwise obtainable.[35] However, the incremental chilling effect engendered by this test, while not as great as in the case of uninhibited discovery, is still significant. First, the editorial relationship may be chilled if its dynamics are subject to forced scrutiny. The knowledge that in a certain number of cases the editorial process will be discoverable is itself likely to chill that process, because no editor can visualize when a court will consider relevancy to be "high" or evidence to be "direct" or "otherwise unobtainable." Beyond this, the com-

promise test is vague, difficult of application, and hence likely to be the subject of constant litigation.[36] In effect, the discovery process itself, and the resulting litigation over the "directly-related," "highly-relevant" and "otherwise-unobtainable" standards, are not merely likely to make editors more cautious, but inevitably will require them to be. The chilling effect of the compromise test is, therefore, of a greater degree than that tolerated by *Sullivan* with the gloss of *Tornillo* and *Columbia Broadcasting*.

There is an additional reason for rejecting the compromise position: it developed in a very different context from that at issue here. *Baker v. F & F Investment, supra*, 470 F.2d at 783–84, in its discussion of *Garland v. Torre*, 259 F.2d 545 (2d Cir.), *cert. denied*, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958), indicates that the appropriate standard for compelled disclosure of journalists' sources in civil litigation is that the evidence is closely related to the very essence of the plaintiff's case and that the information is not obtainable from other sources.[37] However, in *Baker* and *Garland* very different First Amendment interests were at stake from those at issue here. In those cases, the information sought to be disclosed, whether or not vital to the plaintiff's case, was far removed from the editorial process. In this case, the plaintiffs do

receive "communist political propaganda" had to request it of the Post Office held unconstitutional because "any addressee is *likely* to feel some inhibition" at doing so (emphasis added)); *Talley v. California*, 362 U.S. 60, 64, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (requirement that the names and addresses of those who wrote and/or sponsored the distribution of handbills held unconstitutional because it "would *tend* to restrict freedom to distribute information and thereby freedom of expression" (emphasis added)).

34. I do not make the distinction between the institutional press and the individual pamphleteer which Judge Meskill suggests in dissent, *post* at 997. Rather, the distinction I draw is between communicative functions properly protected under the Free Press clause and expression protected by the Free Speech guarantee.

35. Of course, the number of instances that the evidence is in fact not otherwise obtainable in

some form should be few. This does not mean that the chilling effect in the editorial room would be concomitantly reduced. The fear of such discovery and of the full scale utilization of the litigation process as permitted by the compromise test is likely to stifle the flow of ideas in the editorial room.

36. *See New York Times Co. v. Sullivan, supra*, 376 U.S. at 277–78, 84 S.Ct. 710, 11 L.Ed.2d 686.

37. *Cf. Branzburg v. Hayes, supra* (rejecting argument of journalists who had witnessed crimes that they were not obliged to testify before grand juries with respect thereto). In *Baker v. F & F Investment, supra*, 470 F.2d at 783, the Second Circuit distinguished *Branzburg* and thereby protected journalists from compelled disclosure of sources in civil litigation.

not seek discovery on the periphery of the editorial process. That they have already done, as Chief Judge Kaufman notes, to the tune of 2,903 pages in deposition testimony and of 240 exhibits. Rather, plaintiffs now seek to discover the very heart of the editorial process. This they may not do consistently with *Tornillo's* and *Columbia Broadcasting's* solicitude for the editorial process. I, therefore, would conclude that *Tornillo, Columbia Broadcasting* and *Sullivan* mandate full protection of the editorial process from compelled disclosure. This is true because as soon as facts are set in their context there is editorial selection; as soon as that process is subject to scrutiny, there is a suppression effect; and as soon as there is such an effect, the freedom of the press has evaporated.

## IV

I pass then to when editorial process immunity from compelled disclosure is properly invoked. The parameters of the editorial process concept will become more definite in the context of future cases. The obvious starting point, however, is the Chief Justice's delineation in *Tornillo* : "[t]he choice of material" to go into the broadcast, "the decisions made" on the duration and "content" of the broadcast, and "treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment." 418 U.S. at 258, 94 S.Ct. at 2840. Thus, *Tornillo* mandates that the mental processes of the press regarding "choice of material," duration, and "content" of the broadcast are to be protected from scrutiny.[38]

At this stage of the proceedings we are not capable of determining which discovery demands fall within the editorial process privilege. I agree with the Chief Judge that at least five of the broad categories into which the district court grouped plaintiff's questions seemingly fall within the

privilege. Each area of dispute relates to Lando's conclusions, opinions, intentions, or conversations concerning people or leads to be pursued, the veracity of persons interviewed, and Lando's reasons for the inclusion or exclusion of certain material. By permitting interrogation into these areas of editorial selection, the judiciary improperly intrudes upon freedom of the press just as the Florida legislature did in *Tornillo.* Whether the intrusion is judicial or legislative, the result is an unconstitutional suppression effect. There may, however, be individual questions inappropriately grouped within the protected categories. I think it is open to the district judge to determine in specific instances that Lando was not engaged in the process of editorial selection. With these caveats I concur in the general answer to the certified question and in the remand to the district court for a determination of the nature of each question in dispute.

MESKILL, Circuit Judge (dissenting):

I respectfully dissent. In this action, Anthony Herbert alleges that he has been libeled by Barry Lando, Mike Wallace, C.B.S. and Atlantic Monthly. Under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), he may prevail if he proves that the defendants acted with "actual malice," that is, knowing or reckless disregard of the truth. The major purpose of this lawsuit, therefore, is to expose the defendants' subjective state of mind—their thoughts, beliefs, opinions, intentions, motives and conclusions—to the light of judicial review. Obviously, such a review has a "chilling" or deterrent effect. It is supposed to. The publication of lies should be discouraged. The discovery by a libel plaintiff of an editor's state of mind will not chill First Amendment activity to any greater extent than it is already being

---

**38.** To the extent that *Buckley v. Vidal,* 50 F.R.D. 271 (S.D.N.Y.1970), is inconsistent with this opinion, this court obviously now declines to follow it.

While the question need not be answered here, I would assume that the very same pro-

tection would be afforded the press in a trial on the merits. Compelled testimony at trial on matters privileged from compelled pretrial discovery should similarly be privileged, because this case concerns privilege, not undue oppression. *See* text accompanying notes 7–9 *supra.*

chilled as a result of the very review permitted by *New York Times v. Sullivan.* The majority's attempt to eliminate or reduce that chill is supportable in neither precedent nor logic.

The plaintiff in a libel action bears the heavy burden of proving actual malice by clear and convincing proof. The notion that a plaintiff carrying such a burden should be denied the right to ask what the defendant's mental state was is remarkable on its face. In my view Judge Haight was quite right to apply the normal rules of discovery and to permit inquiry into the defendants' mental state.

Chief Judge Kaufman finds a basis for creating a new editorial privilege in "the privilege established by *Branzburg* [*v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)]," *ante* at 227, and in the Supreme Court's decisions in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (right of reply statute), and *C.B.S., Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (editorial advertising), which deal generally with the protections afforded to "the exercise of editorial control and judgment." 418 U.S. at 258, 94 S.Ct. at 2840. By combining the *Branzburg* privilege with the *Tornillo* and *C.B.S.* protections for editing, the Chief Judge creates an editorial privilege. Judge Oakes adopts a somewhat different approach. He too relies on *Branzburg, Tornillo* and *C.B.S.*, but he goes further and, relying primarily on a speech given by Mr. Justice Stewart at the Yale Law School, extracts from the free press clause a doctrine which appears to convert the fourth estate into an institution not unlike an unofficial fourth branch of government. This fourth branch is given a special privilege presumably for the same reasons that the three official branches are given executive, congressional and judicial privileges.

I find neither approach persuasive. Contrary to the suggestions of my colleagues, there is presently no constitutional privilege against disclosure of a journalist's confidential sources, either in the criminal context, *Branzburg v. Hayes, supra,* or in the civil context, *Garland v. Torre*, 259 F.2d 545 (2d Cir.) (Stewart, *J.*) (libel action), *cert. denied*, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958). *Baker v. F & F Investment*, 470 F.2d 778 (2d Cir. 1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973), which is cited by the majority as supporting such a privilege, merely held that a district judge in a civil case did not abuse his discretion in denying a motion to compel a non-party journalist to disclose the identity of a confidential news source where the identity of the source was of questionable materiality to the plaintiff's cause of action and could be obtained by other means. The Court explained:

> Although it is safe to conclude, particularly after the Supreme Court's decision in *Branzburg* . . . that federal law does not recognize an absolute or conditional journalist's testimonial "privilege", neither does federal law require disclosure of confidential sources in each and every case, both civil and criminal, in which the issue is raised.

470 F.2d at 781. The decision stands for the proposition, with which I wholeheartedly agree, that the public interest reflected in the First Amendment and in State "newsman's privilege" statutes is entitled to be considered when a district judge exercises discretion with regard to discovery matters. The decision recognized no privilege. In view of *Branzburg* and *Garland* it could not have. *See also Caldero v. Tribune Publishing Co.*, 98 Idaho 288, 562 P.2d 791, *cert. denied*, —— U.S. ——, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977); *Carey v. Hume*, 160 U.S.App.D.C. 365, 492 F.2d 631, *cert. dismissed*, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974). Thus, to the extent that the majority relies on "the privilege established by *Branzburg*" and its elaboration in *Baker*, today's decision is without precedential foundation.

The *Tornillo* and *C.B.S.* decisions also provide little support for the privilege created by the majority. Those cases establish that when the government tries to control what is published or broadcast the courts may

find an unconstitutional "intrusion into the function of editors." 418 U.S. at 258, 94 S.Ct. at 2839. Neither decision supports the unqualified "proposition that the First Amendment will not tolerate intrusion into the decisionmaking function of editors." *Ante* at 987 (Oakes, *J.*, concurring). Some intrusions, such as those which occur when the press is required to publish or broadcast views with which it disagrees, are prohibited. Other intrusions, such as the intrusion inherent in all libel actions, are permitted. *See generally Branzburg v. Hayes, supra,* 408 U.S. at 681–85, 92 S.Ct. 2646. The intrusion against which the majority seeks to protect editors is the chilling effect that "judicial review of the editor's thought processes," *ante* at 980, will have on the "exercise of editorial judgment." *Id.* at 980; 990–991 (Oakes, *J.,* concurring). After *New York Times v. Sullivan,* however, judicial review of the editor's thought process is what a libel action is all about. The mere existence of a libel cause of action chills the exercise of editorial judgment. That is the whole idea. It is exactly this kind of chill that *New York Times v. Sullivan* condones.

Judge Oakes' argument based on the "structural or institutional aspect of the Free Press guarantee," *ante* at 988, is troubling for two reasons. First, I doubt whether it can be considered to add anything to the Chief Judge's arguments based on *Branzburg, Tornillo* and *C.B.S.* Second, before the Court can recognize any special, preferred position for the press as an institution, it must necessarily recognize a distinction between personal rights on the one hand and institutional rights on the other. "Freedom of the press is a 'fundamental personal right' " which encompasses "the right of the lonely pamphleteer who uses carbon paper or a mimeograph" as well as that of "the large metropolitan publisher who utilizes the latest photocomposition methods." *Branzburg v. Hayes, supra,* 408 U.S. at 704, 92 S.Ct. at 2668, *quoting, Lovell v. Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 1242 (1938). If we distinguish between institutional and personal rights to liberty of the press and place the former in a preferred position, then we necessarily place the latter in a subordinate position. The First Amendment interest of the public in having access to the truth is not necessarily better served by an institution than an individual. I would recognize such a distinction only with the greatest reluctance, and I would certainly not do so on the basis of a single speech, even one given by Mr. Justice Stewart. *Compare Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974), in which the Supreme Court, per Mr. Justice Stewart, held that journalists have no special access to information not available to the public generally.

It makes no sense at all for us to construct a privilege designed to eliminate or reduce a chill on expressive activity which is already generated by the libel action itself. I do recognize, however, that some of the discovery sought by Herbert, particularly the conversations sought in the fourth of the five categories of assertedly objectionable inquiries, *ante* at 983, has a potential for what Judge Oakes refers to as an "incremental" chilling effect, *ante* at 993–994, over and above that contemplated by *New York Times v. Sullivan.* The discovery of communications between editors and journalists, as distinguished from subjective mental states, may well have the effect of inhibiting "the free interchange of ideas within the news room." *Ante* at 980, 990 (Oakes, *J.,* concurring). If the press were forced to disclose all of the ideas and theories that are explored during the editorial process, then intellectual exploration itself would be discouraged—without necessarily, or even probably, deterring irresponsible journalism. By thus discouraging "the creative verbal testing, probing, and discussion of hypotheses and alternatives which are the *sine qua non* of responsible journalism," *ante* at 980; *see* 993–994 (Oakes, *J.,* concurring), discovery of the communications sought under category four could have an incremental chilling effect not built into the *New York Times v. Sullivan* libel action. The operation of this incremental chill is actually rather conven-

**998**

tional in nature. It is the same sort of chill that forms the basis for most privileges: a chill on the expression of ideas or the communication of information in the context of certain special, lawful, confidential relationships. However, a moment's reflection will reveal that a privilege sufficient to eliminate this incremental chill would have to be exceedingly broad. All confidential communications, whether oral or written and whether made in the newsroom or elsewhere, would have to be covered. It seems to me that if such a privilege were really necessary to protect the editorial function, we would have heard about it long before now. Like the Supreme Court in *Branzburg*, I would be "unwilling to embark the judiciary on a long and difficult journey to such an uncertain destination." 408 U.S. at 703, 92 S.Ct. at 2668. The Supreme Court has shown no enthusiasm for the creation of new constitutional privileges, particularly where, as here, they are based on claims of chilling effect that depend on the imaginations of judges rather than proof supplied by the parties. *Compare Branzburg v. Hayes, supra*, 408 U.S. at 693–95, 92 S.Ct. 2646, *with N.A.A.C.P. v. Alabama ex rel. Patterson*, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (in support of its claim of a privilege against disclosure of the identity of its rank-and-file membership, the NAACP made an "uncontroverted showing" that exposure had in the past led to harassment of its membership).

I would affirm Judge Haight's order compelling discovery.