Peter W. SLUYS, and Arthur
R. Aldrich, Plaintiffs,

v.

Kenneth GRIBETZ, as District Attorney of the County of Rockland, and Kenneth Gribetz, Personally, Peter Modafferi, John T. Grant and Six Other Unknown Conspirators, Defendant.

No. 93 Civ. 6704 (CLB).

United States District Court,
S.D. New York.

Jan. 31, 1994.

Peter W. Sluys, pro se.

Dornbush Mensch Mandelstam & Schaeffer, New York City, for Kenneth Gribetz and Peter Modafferi.

Patterson, Belknap, Webb & Tyler, New York City, for John T. Grant.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

This civil rights action was filed *pro se* on September 24, 1993, by plaintiff Peter W. Sluys. Arthur R. Aldrich was permitted to become an additional plaintiff by order dated November 16, 1993.

The defendants are the Hon. Kenneth Gribetz individually, and as District Attorney of the County of Rockland, State of New York, in this District; Peter Modafferi, individually, and as a criminal investigator employed in the office of Mr. Gribetz; and John T. Grant, the County Executive of the County of Rockland through December 31, 1993.

By order issued November 17, 1993, by the Court on its own motion, and returnable December 1, 1993, the parties were, "invited to show cause why this action should not be dismissed by this Court as moot by reason of intervening events". By motion dated November 15, 1993, defendant Grant moved pursuant to Rule 12(c) F.R.Civ.P. for judgment on the pleadings. This motion was fully submitted for decision as of December 8, 1993 following a dispute because plaintiff was willing to discontinue against Mr. Grant "without prejudice", and counsel for Mr. Grant demanded a dismissal "with prejudice". The "six other unknown conspirators" mentioned in the caption of the case remain unknown, and there is no persuasive evidence that any such exist.

The Plaintiffs are editors and/or publishers affiliated with Community Media, Inc., which owns three local newspapers known as *Our Town, The Clarkstown Courier,* and *The Rockland Independent,* which papers circulate in the County of Rockland. Mr. Sluys is a former member of the Bar. By his complaint filed February 24, 1988, plaintiff alleged that defendants Gribetz and Modafferi, acting under color of state law because of their official positions, caused him to be invited to the Office of the District Attorney for an interview on August 2, 1993. At this interview according to plaintiff, Sluys (¶ 21 *et seq.* of Complaint) was told by defendant Modafferi that he was, "going to jail unless you turn over on Knight (another editor for Community Media, Inc.) and Aldrich"; that he was in "deep shit", and that as a "predicate felon" plaintiff would go to jail for quite some time unless he immediately confessed to taking a bribe from Orange & Rockland Utilities.[1] Plaintiff Sluys alleges (¶ 27) that he was, "asked to wear a wire and meet with Linda Winikow (then an executive with Orange & Rockland Utilities)", and to tell Winikow on the wire that, "I know you have been bribing us", or alternatively, "I know we have been blackmailing you." Plaintiff refused to do either.

The District Attorney's Office obtained voluntarily from Community Media all files having to do with advertising of Orange & Rockland Utilities. The Complaint details addi-

---

1. The use of vile and abusive language is never a basis for a civil rights action. *Batista v. Rogriguez,* 702 F.2d 393, 395 (2d Cir.1983)

tional efforts to obtain the assistance of plaintiff and of Aldrich as witnesses, or in the case of plaintiff, as an undercover investigator, and it is alleged that Modafferi threatened to ruin Aldrich's reputation (¶ 38). The Complaint also alleges a "conspiracy" and that the actions of Modafferi and Gribetz were, "initiated or acted upon at the request of defendant Grant ... in part as punishment for the fact that Community Media newspapers had been supporting Samuel Colman against Grant in the 1993 Democratic primary for County Executive."

The Complaint continues, alleging further activities said to be in violation of the civil rights of the plaintiffs, or the First Amendment Rights of Community Media, Inc. Before proceeding further with the Complaint, however, some additional background is necessary.

Ms. Linda Winikow, not a party to this action, formerly served as a Democratic Member of the New York State Senate representing parts of the Counties of Rockland and Westchester. Thereafter, she accepted full time employment with Orange & Rockland Utilities, a regulated public utility which provides electric and gas service in parts of Rockland County. Thereafter, and at all relevant times until her suspension with pay on August 17, 1993, Ms. Winikow served Orange & Rockland Utilities as Vice President for Corporate Policy and External Affairs.

A contested primary in the Democratic party developed in 1993 between defendant John T. Grant and one Samuel Colman, a member of the New York State Assembly and not a party to this action. Mr. Colman's candidacy was supported by Ms. Winikow and also by these plaintiffs and their publications. Mr. Gribetz, it is alleged, was partial to the candidacy of Mr. Grant. Mr. Grant was the victor in the primary by a narrow margin and, as is so often the case following such internecine strife in a political party, he was defeated at the general election by the Republican candidate and departed the Office of County Executive on December 31, 1993.

On the day following the suspension with pay of Ms. Winikow as Vice President for Corporate Policy and External Affairs of Orange & Rockland Utilities, District Attorney Gribetz announced (Complaint, ¶ 42) that his investigation concerning the financial affairs of Orange & Rockland Utilities,

"has expanded into allegations of commercial bribery with respect to the awarding of a $41,000 per annum contract between Orange & Rockland Utilities and Community Media, Inc."

Gribetz stated that,

"media contracts were awarded from the Corporate Communications Department at Orange & Rockland Utilities, which was directed by Linda Winikow, Vice President for Corporate Policy and External Affairs until her suspension with pay on August 13, 1993."

Gribetz stated that,

"*Our Town* had published a series of articles which were highly critical of Jim Smith, the C.E.O. of Orange & Rockland Utilities and Vice President Linda Winikow. The articles were critical of their salaries, expense accounts, pensions, and fringe benefits."

Gribetz stated that,

"Subsequent to the publication of these articles, on July 21, 1992, a contract was entered into in the amount of $41,600.00 for advertising, per annum, between Orange & Rockland Utilities and Community Media, Inc. No such articles have appeared in Community Media, Inc.'s newspapers after July 21, 1992."

Gribetz further stated that,

"The contract was renewed for a second year in the amount of $41,600.00 on March 8, 1993. Payment for the first contract was paid in full, in advance. Gribetz stated that although the payment was made in full, Orange & Rockland Utilities failed to supply advertising to the newspaper totaling the contract amount."

The release continued, and pointed out that Grand Jury Subpoenas had been issued, and that the utility was, "one of the largest advertisers for Community Media, Inc."

Other newspapers printed the release, and radio news broadcasts repeated the charge

that Sluys was guilty of commercial bribe receiving.

Contemporaneous publicity releases by Orange & Rockland Utilities denied any inappropriate arrangements with Community Media and noted that the utility, "buys ads from time to time from many different media outlets". (Donovan press release attached to complaint).

At the same time that all of this was going on, Ms. Winikow was also under investigation by the District Attorney for having caused vendors of Orange & Rockland Utilities to make payments in goods or services to the Colman primary campaign as a condition for the continued receipt of business from the utility, and to have engaged in other diversions of funds of her employer. These activities are alleged in some detail in companion litigation pending in this Court in the nature of a Class Action by ratepayers (*Feiner v. Orange & Rockland Utilities, Inc., et al.,* 93 Civ. 5796 (CLB)), and a RICO action brought by the utility itself against Ms. Winikow and others, 93 Civ. 6038 (CLB). In the latter case, Orange & Rockland Utilities as plaintiff charged Ms. Winikow and other employees of Orange & Rockland with having participated in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962 in that Winikow and others, with the aid of corrupt vendors, defrauded the utility by diverting funds totaling over $125,000 to enrich the individual defendants, or pay their personal expenses or engage in political contributions, including $5,000 to United States Senator Joseph Lieberman of Connecticut; $10,000 in printing services for New York State Assemblyman Sam Colman and defraying the costs of the engagement party for Winikow's son, Jeffrey, the printing of business cards and stationery for her son's law firm; printing for advertisements for one Hansen, a candidate for the Rockland County Legislature; and, contributions to various other candidates for public office, many of them in trivial amounts.

The Complaint alleges that the District Attorney also investigated allegations that certain school districts had given legal advertising to Community Media and its newspapers, "in order that Community Media not publish unfavorable articles about them", and also investigated a purported extortion of Dr. Richard Alcott.

The Complaint alleged that these investigations were improper as a matter of law and caused in whole or in part not by a good faith belief that there had been any violation of the criminal law, but rather were done at the instance of Grant, or Grant's supporters and "operatives". (¶ 53). The Complaint alleges (¶ 58) that the investigations were intended, "to effect [sic] the reporting of stories about County Executive John Grant", and to, "discredit plaintiff and plaintiff's stories in the eyes of the general public, and to aid in the defeat of Samuel Colman as a candidate in the Democratic primary." (¶ 58).

Further reference to the detailed allegations of the Complaint is not necessary for the purposes of this decision, and familiarity with that document containing seventy-seven separately numbered paragraphs exclusive of the prayer for relief, must be assumed. The Complaint fairly pleads an intent to coerce and an intent to chill the rights of plaintiffs under the First Amendment, and to interfere with the right of the newspaper to publish editorials in support of Colman and investigative reports about Grant.

■ It is claimed that Mr. Grant conspired with or requested Gribetz to engage in the violative conduct, and that this constituted an actionable conspiracy by Grant. Obviously, Grant has no power to convene a Grand Jury, or to prosecute Sluys, Aldrich, or Community Media, and there is no contention to the contrary. Ordinarily, private citizens have the right to seek redress from public officials for real or fancied wrongs, and if the public official thereafter violates anybody's Constitutional rights, the private person who activated that official is ordinarily not liable under the civil rights laws on a conspiracy theory. The entire theory of a conspiracy is that two or more persons are acting together to effectuate an unlawful purpose. This assumes an agreement so to act, either by express assent or by inference from conduct. Under such a conspiratorial agreement, different members of the conspiracy agree to and do perform different acts, each within their powers and abilities, to obtain a

common result. Mere suggestion or request of the sort alleged against Grant does not make him a conspirator, and as noted earlier, under the circumstances of this case there is no way in which Grant could have done or helped to do any of the acts which were the objects of the so-called Grand Jury conspiracy. Citizens urging action by public officials are presumed to intend that the official will act lawfully. It was impossible for Grant to have played any part in the particular conspiracy alleged, because he had no power to do so.

■ On October 6, 1993, Linda Winikow appeared with her attorney and District Attorney Gribetz before the Hon. Robert R. Meehan, Acting Justice of the Supreme Court of the State of New York, County of Rockland, and waived indictment as to three separate informations. In connection with her pleas of guilty to all three charges, Ms. Winikow testified under oath. She admitted that as to the first charge, between March 1, 1993 and August 11, 1993 she stole U.S. currency in excess of $3,000 from Stanford Silverman, the President of Devotion, Inc. by instilling in him a fear that if he did not pay she or another would perform an act calculated to harm Mr. Silverman with respect to his business by terminating Devotion's advertising contract with Orange & Rockland Utilities. Devotion, Inc. was said by her to be an advertising agency for designing and placing advertising, and a vendor with whom Orange & Rockland did business during the relevant time period, receiving business from the utility in the amount of approximately one million dollars in 1992–93. Ms. Winikow also admitted that she asked Mr. Silverman to make political donations on behalf of Orange & Rockland Utilities by donating money to, "various political campaign committees", and told him that he would lose Devotion's contract with Orange & Rockland, "if he did not make $25,000 worth of personal expenses and political contributions on behalf of Orange & Rockland per year". (Transcript of Plea at p. 14, annexed as Exhibit to Document 10 in this case)

As to the second charge, Ms. Winikow testified that on or about and between March 18, 1992 and July 21, 1993 she, being an employee of Orange & Rockland Utilities, without the consent of her employer, accepted or agreed to accept a benefit "to wit cessation of negative press coverage—negative press about Orange & Rockland Utilities, Inc. from another person, to wit, [plaintiffs] upon an agreement or understanding that such benefit would influence her conduct in relation to her employer's or principal's affairs, to wit, by entering into an advertising contract with ... Community Media, Inc. ...".

Ms. Winikow testified in detail at her arraignment that plaintiffs' publication printed articles which were, "very negative and primarily about some of the perks as well", concerning herself and Mr. Smith, the President and Chairman of the Board, and about the utility. She testified that she never would have engaged in the advertising contract were it not for the negative press coverage which she, Mr. Smith and the utility had received, but that she did not have the consent of her employer when she entered into this contract.

In connection with the third charge, Ms. Winikow testified that between March 1, 1992 and April 28, 1992 she made a contribution on behalf of Orange & Rockland Utilities to, "The Friends of Sam Colman Committee" in a name other than the true contributor by having Midland Park Graphics, Inc., an Orange & Rockland vendor, appear to be the contributor, and also print campaign and related material for use at the Colman Committee fundraiser, valued at $2,379, the expense of which was paid by the utility. Under the same charge she admitted a further contribution under the name of Midland Park Graphics, Inc. by having that concern issue a check to the Colman Committee in the amount of $1,485, and that Midland Park Graphics was reimbursed by Orange & Rockland Utilities for that check. Furthermore, she admitted that a further campaign contribution was made under the name of Maxine Epstein, and another by Mark DeBlasio, in each case by having Mr. Silverman, the president of Devotion, "solicit a third party to issue a personal check", and that she had asked Silverman to get third party checks made out to the Colman campaign as political

donations on behalf of Orange & Rockland Utilities, which she describes in her testimony as being, "the true contributor". She testified that she had done so to the knowledge of Mr. Colman. The attorney for Ms. Winikow told the Court that the pleas of guilty, "cover all matters that Mrs. Winikow has told the District Attorneys Office about, to include expense account violations and other election law violations under State of New York laws". (Transcript at p. 37).

The plea allocution made clear at several points through statements by the Justice presiding, that it was contemplated that Ms. Winikow would be a cooperating individual against others, and that her sentence was to be put off until all such matters had been resolved.

From the foregoing it appeared clear to the plaintiffs that they were targets of a Grand Jury investigation and possible State prosecution. Indeed, this fact was confirmed as of October 19, 1993, in the affidavit of Kenneth Gribetz, filed as Document 10 in this case.

By motion dated October 12, 1993, Sluys sought a preliminary injunction preventing Gribetz from, "presenting to the Grand Jury or in any other way prosecuting the plaintiff for the crime of Commercial Bribe Receiving under New York State Penal Law 180, or the crime of Coercion under § 135.60" based upon the incidents referred to in the plea allocution of Ms. Winikow. The basis for the preliminary injunction, and the basis for this lawsuit itself, was a claimed violation of the rights of plaintiff under the First and Fourteenth Amendments.

A hearing was held October 25, 1993 on the return of the motion for a preliminary injunction. At the conclusion of the hearing, the motion was denied, "with leave to renew upon a clear showing of action by any defendant having a genuine threat to chill the First Amendment rights of the plaintiff." Plaintiff, Sluys, was in effect invited to return to this Court were he indicted. Thereafter, Rockland County District Attorney Gribetz made a public announcement on November 16, 1993 that he would not prosecute Sluys or Aldrich. His press release advised, in relevant part, as follows:

"Gribetz said that, 'a special grand jury probing corruption [at Orange & Rockland Utilities] would not hear evidence against Community Media, Inc. of Pearl River or its employees, saying that constitutional issues made prosecution impossible.'

'The District Attorneys Office has concluded that on constitutional grounds, particularly the First Amendment of the U.S. Constitution, Community Media or its employees cannot be successfully prosecuted', Gribetz said in a statement."

Clearly, this conclusion was correct.

■ The constitutional protections afforded the dissemination and acquisition of information (news), as pointed out by then Chief Judge Kaufman in *Herbert v. Lando*, 568 F.2d 974, 978 (2d Cir.1977, reversed on other grounds, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115) recognize that the editorial process also must be safeguarded. In Chief Judge Kaufman's words, "The media is not a conduit which receives information and, senselessly, spews it forth. The act of exercise of human judgment must transform the raw data of reportage into a finished product. The Supreme Court cases which grant protection to the editors so shaping the news are unequivocal in their terms."

For example, in *Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), cited *Herbert v. Lando, supra*, the Supreme Court held that a publication could not be compelled by the State to accept editorial replies. The court recognized that the treatment of public issues and officials—whether fair or unfair—constituted the exercise of editorial control and judgment, and that the existence of a right of reply statute would unconstitutionally burden an editor's exercise of judgment in choosing whether or not to print a newsworthy material.

■ An editor is confronted each day of publication with a large news "hole", representing those column inches of the publication not devoted to advertising and editorials, which must be filled with news. It is or should be obvious that in making a judgment as to what stories go in the news hole and

what stories are spiked, the editor exercises a judgment protected by the First Amendment. Furthermore, we should understand that it is impossible to write a news story without slanting the news in some fashion, by choice of words, punctuation, emphasis, the order in which the facts are stated, or by numerous other ways and means, intentional and unintentional.

Accordingly, it is not possible for anyone, including a grand jury, a trial jury, or a prosecutor, to ascertain whether the news columns of a particular publication have been made "favorable" or "unfavorable" to the management of a public utility, or whether unfavorable news has been withheld as part of a corrupt bargain paid for indirectly by advertising, or as a result of an honest editorial judgment as to the "newsworthiness" of a particular episode concerning the utility, compared to other events competing for coverage on that day.

The theory of any prosecution based on an *agreement* to refrain from publishing adverse news or comment concerning a public figure or an enterprise affected by the public interest such as Orange & Rockland Utilities, must of necessity consider whether the alleged agreement was actually performed. To do this, a court or jury must, of necessity, intrude into the editorial judgment protected by the First Amendment of the Constitution. As stated in *Columbia Broadcasting System v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772, quoted in *Herbert v. Lando,* supra, "For better or worse, editing is what editors are for, and editing is selection and choice of material."

We quote further from *Herbert v. Lando:*
"It is clear from what we have said that newsgathering and dissemination can be subverted by indirect, as well as direct, restraints. It is equally manifest that the vitality of the editorial process can be sapped too if we are not vigilant. The unambiguous wisdom of *Tornillo* and *CBS* is that we must encourage, and protect against encroachment, full and candid discussion within the newsroom itself. In the light of these constitutional imperatives, the issue presented by this case is whether, and to what extent, inquiry into the

editorial process, conducted during discovery in a *New York Times v. Sullivan* [403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) ] libel action, impermissibly burdens the work of reporters and broadcasters.

This case is stronger than *Herbert* which involved a libel action and was reversed by the Supreme Court in order to be consistent with the *Sullivan* rule. In the instant case, a criminal prosecution was apparently sought to be maintained on the theory that the editorial process had been distorted in order to favor an advertiser. The very inquiry into the editorial process necessary to prosecute or defend such a case violates the constitutional protection granted to an editor by *Tornillo, Columbia Broadcasting,* and *Herbert v. Lando.*

That this clear legal impediment to the proposed prosecution was recognized, somewhat belatedly, by the District Attorney of Rockland County, in this Court's opinion moots the case as to Sluys and Aldrich. We would consider them prevailing parties, and were they represented by counsel an award of legal fees might be appropriate. Insofar as concerns Grant, in addition to being moot the complaint fails to state a claim upon which relief can be granted.

The Clerk of the Court is directed to enter Judgment dismissing the action with prejudice, and without costs.

SO ORDERED.