Irving **FEINER**, Allan A. Thompson, Mario Norelli, Daniel T. Mahoney, Leonard Paduto, Stella's Deli, Inc., on behalf of themselves and others similarly situated, Plaintiffs,

v.

**ORANGE & ROCKLAND UTILITIES, INC.**, Rockland Electric Company, Linda Winikow, Paul Pickard, Maria Pickard, Communications Strategies International and John and Jane Does 1 through 20, Defendants.

No. 93 Civ. 5796 (CLB).

United States District Court, S.D. New York.

Sept. 8, 1994.

Gary Graifman, Kantrowitz & Goldmaner, P.C., Chestnut Ridge, NY, for plaintiffs.

John M. Townsend and Dan Weiner, Hughes Hubbard & Reed, New York City, for defendants Orange & Rockland Utilities, Inc. and Rockland Elec. Co.

John Harris, Marjorie Peerce, Stillman, Friedman & Shaw, P.C. and William Frank, Birbrower, Montalbano, Condon & Frank, P.C., New City City, for defendant Linda Winikow.

Mark Freyburg, Fischetti & Russo, New York City, for defendants Paul Pickard and Maria Pickard.

Walton Bader, Bader and Bader, White Plains, NY, for non-party (Involved in State Court Litigation) Merle Davis.

### MEMORANDUM AND ORDER

BRIEANT, District Judge.

Defendants Orange & Rockland Utilities, Inc., ("O & R"), its subsidiary Rockland Electric Company, and Linda Winikow in this Civil RICO action move pursuant to Rule 12(b)6, to dismiss the amended complaint docketed October 6, 1993. Whether this litigation should be maintained as a class action

has not yet been determined by the Court, although a motion for that relief is pending.

The plaintiffs refer to themselves as representing a class of ratepayers (customers) of Orange & Rockland Utilities, Inc., which is a franchised utility serving the public in Orange and Rockland Counties with electric and gas service under published tariffs and rates allowed or approved by the Public Service Commission of the State of New York (the "PSC"). Defendant Linda Winikow was, until her suspension with pay on August 17, 1993, a Vice President and Director of Corporate Policy and External Affairs (whatever they are) of O & R.[1] Defendant Paul Pickard is alleged to have been since July 1992 a "director in the Corporate Communications Department" of O & R and in addition, a principal of defendant Communications Strategies International ("CSI"). Maria Pickard is alleged to have been a "supervisor in the Communications Service Department" of O & R until June 1991, and thereafter until November 1991 a "consultant" to O & R and also a principal in defendant CSI.

The complaint is based on 18 U.S.C. § 1961 et seq. and the Common Law of New York to recover damages, treble damages and counsel fees allegedly sustained by the class members from having paid higher electric and gas rates than they otherwise would have paid, since 1984, by reason of "defendants' scheme to defraud, defendants' acts of mail and wire fraud, 18 U.S.C. §§ 1331 [1341] and 1343, acts of bribery and extortion indictable under state and federal bribery and extortion laws; violation of the New York State Public Service Law § 107, [and] violation of the New York State Election Laws (§ 14–116(2)) in connection with illegal misuse and illegal contribution of funds paid by ratepayers to O & R". (Amd.Compl. ¶ 1)

The theory of the complaint is essentially that the defendants conducted and participated in the affairs of an enterprise through a pattern of racketeering activity. It is alleged (Amended Complaint ¶ 25) that commencing in about 1984 O & R began a course of conduct in which it "misused funds obtained from ratepayers as a result of electric and gas rate billing allowed and authorized by the New York Public Service Commission for the illegal, improper and unreported purpose of making campaign and political payments and contributions to various public officials and politicians in violation of various statutes and regulatory provisions, and for unauthorized personal expenses of themselves and their families." Of necessity, our summary of the amended class action complaint is somewhat superficial. It consists of 63 pages and 105 numbered paragraphs exclusive of the demand for relief estimated at $900,000,-000.00, and familiarity of the reader therewith must be assumed.

The initial factual basis for this lawsuit was supplied by the arrest of and subsequent plea of guilty by defendant Winikow growing out of an investigation by the New York State Grand Jury in Rockland County into the financial affairs of O & R. On October 6, 1993, defendant Linda Winikow appeared with her attorney and the Hon. Kenneth Gribetz, District Attorney of Rockland County before the Hon. Robert T. Meehan, Acting Justice of the Supreme Court of the State of New York, County of Rockland, presiding in County Court, and waived indictment as to three separate criminal charges.

In connection with her plea of guilty to all of these charges, Ms. Winikow testified under oath and admitted that she had, between March 1, 1993 and August 11, 1993 extorted $3,000.00 in U.S. currency from Stanford Silverman, the president of Devotion, Inc., a vendor serving O & R, by instilling in him a fear that if he did not pay, she or another, would cause Devotion's advertising contract with O & R to be terminated, resulting in a loss of business from O & R to Silverman's advertising agency, Devotion, Inc., in the amount of approximately one million dollars in 1992–1993. She also testified that she asked Mr. Silverman to make political donations on behalf of O & R by donating money, "to various political campaign committees" and told him that he would lose Devotion's contract with O & R, "if he did not make

---

[1]. Ms. Winikow was fired on August 26, 1993, and has been sued by the utility. See infra p. 1087.

$25,000.00 worth of personal expenses and political contributions in behalf of Orange & Rockland per year" (Tr. of Plea at p. 14) produced to this Court as part of the pleadings in a related litigation, *Sluys v. Gribetz*, 842 F.Supp. 764 (S.D.N.Y.1994).

In her plea to the second charge, Ms. Winikow testified that she entered into an advertising contract with Community Media, Inc. on behalf of O & R and agreed without the consent of her employer to accept a benefit from the advertising contract, "to wit, cessation of negative press coverage—negative press about Orange & Rockland Utilities, Inc. from another person ... upon an agreement or understanding that such benefit would influence her conduct in relation to her employer's or principal's affairs...."

■ In her plea to the third charge Ms. Winikow testified that between March 1, 1992 and April 28, 1992, she made a political contribution in behalf of O & R to "The Friends of Sam Colman Committee" in a name other than the true contributor by having Midland Park Graphics, Inc., an O & R vendor, appear to be the contributor, and also print campaign and related material for use at a Colman Committee fundraiser valued at $2,379, the expense of which was paid by O & R. Under the same charge she admitted a further contribution under the name of Midland Park Graphics, Inc. by having that firm issue a check to the Colman Campaign Committee in the amount of $1,485 and that Midland Park Graphics was reimbursed by O & R for the amount of that check. Furthermore, she admitted that a further political campaign contribution was made under the name of Maxine Epstein, and another by Mark DeBlasio, in each case by having Mr. Silverman, the president of Devotion, Inc., "solicit a third party to issue a personal check", and that she had asked Silverman to get third party checks made out to

the Colman campaign as political donations on behalf of Orange & Rockland Utilities, which she describes in her testimony before Justice Meehan as being "the true contributor".[2]

In addition to the diversion of funds of O & R which were disclosed by Ms. Winikow in her plea of guilty, it was disclosed that other payments of a fraudulent nature were made directly or indirectly by others, including defendant CSI, and charged directly or indirectly to O & R in a manner so as to conceal the true purposes of the payments, or the identity of the payer, or both. Some of these payments were illegal and others were not expenses properly chargeable to the utility.[3]

The allegations of fraudulent diversion of funds and fraudulent representation to the ratepayers and the rate regulators contained in the amended complaint are far broader than the information uncovered by the Rockland County Grand Jury investigation. Included are claims of affirmative misrepresentations made after the wrongdoing came to light, as to the nature, extent and amount of the unauthorized, illegal, improper or unreported payments and items of bribery and extortion. Substantial diversion of funds is also charged based on payment of personal expenses of O & R's then Chief Executive Officer James F. Smith, expenses of Ms. Winikow and others.

The complaint also charges that defendants concealed and affirmatively misrepresented to the PSC projections for future electricity and gas demand in the franchised area.

The Board of Directors of O & R established a Special Committee to investigate, ascertain and report the amount of funds diverted. That amount appears to be substantial, although it is also obvious that only a small proportion of the money was taken

---

**2.** Mr. Colman, at the time a member of the New York State Assembly, was a candidate in a contested Democratic primary against the incumbent John T. Grant for the public office of County Executive of the County of Rockland, within the franchise area served by O & R. A regulated utility in New York may not lawfully make a political contribution.

**3.** Included in the funds diverted were money and services contributed to the campaign of United States Senator Joseph Lieberman of Connecticut, said to consist of "all or part of $19,500 (*O & R v. Winikow* Compl., 93 Civ. 6083, S.D.N.Y. at 17(b), plus $2,651.22 (*id.* at 17(g), and $200.00 (*id.* at 17(h). O & R has no nexus with Connecticut, making these payments inexplicable as well as illegal.

into account as test period expenses for purposes of *pro forma* statements of cost of service used by O & R in rate fixing proceedings before the Public Service Commission. In litigation brought by O & R in this Court as a plaintiff, it is alleged affirmatively that:

> "... Winikow, Schwartz, Paul Pickard, Maria Pickard, CSI, Silverman and Devotion, through fraudulent means, diverted monies and funds rightfully belonging to Orange and Rockland, exercised without permission or authority, exclusive rights of ownership over these funds to the exclusion of Orange and Rockland's exclusive rights of ownership to these funds, thereby converting Orange and Rockland's property."

(¶ 23 of Civil RICO Complaint in *Orange & Rockland Utilities, Inc. v. Linda Winikow, et al.,* S.D.N.Y.Dkt. No. 93 Civ. 6038 (CLB) filed August 26, 1993)

In a lawsuit in the Supreme Court of the State of New York, County of Rockland, brought against James F. Smith (Index No. 0623/94, Complaint dated March 16, 1974) O & R alleges affirmatively in great detail that as Chief Executive Officer of O & R, Smith systematically beginning in 1979 engaged in a continuing course of fraudulent conduct by misappropriating funds of O & R and services "for the personal benefit of himself, his family, his friends, and other persons and organizations with which he had a private relationship" (Smith Compl. ¶ 6) and that through acquiescence or gross negligence "Winikow was permitted to engage in illegal activities including systematic abuse of her expense budget and misappropriation of O & R funds and resources for her own benefit, and violations of election and commercial bribery laws". (Smith Compl. ¶ 10)

The motions attack the complaint on its face on a rather narrow ground, asserting that all claims are barred by what is described as the "Filed Rate Doctrine".

The complaint itself tracks the allegations in *County of Suffolk v. Long Island Lighting Company,* 907 F.2d 1295 (2d Cir.1990). In that case, hereinafter *"LILCO"*, a panel of our Court of Appeals held that "the [RICO]

Statute is not ambiguous as to whether its proscriptions extend to a state regulated public utility." The Court in *LILCO* also rejected the concept of *Burford* abstention,[4] on the theory that the federal court entertaining a RICO case brought by ratepayers based on allegations of fraud committed by the utility in the rate regulation process would be "interfering unduly with specialized ongoing state regulatory schemes" or "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern". The Court of Appeals in *LILCO* held that this was so, notwithstanding "application of a federal RICO remedy would wreak havoc with the state regulatory process and ... the Public Service Commission, not a federal court, is in the best position to provide a remedy in the best interest of ratepayers for frauds allegedly committed in Public Service Commission rate cases."

The New York Attorney General, having been asked by the Court in *LILCO* to comment, opined that, "an award of damages in this case would enhance rather than conflict with New York's regulatory scheme", and the Public Service Commission of New York declined to comment at all. The *LILCO* case also declined to rely on the primary jurisdiction doctrine to defer to the ratemaking agency's supposed expertise (Opinion at p. 1310), and held that the unavailability of treble damages and attorneys' fees was an appropriate matter for its consideration in reaching that result.

Upon careful examination *none* of the legal conclusions expressed in *LILCO* are anything more than *dicta* because the judgment of the district court in favor of *LILCO* was affirmed, however, in light of the clear and lengthy analysis by the Court of Appeals opinion in *LILCO,* we would have been compelled to say that the complaint in this case clearly states a valid Civil RICO claim upon which relief can be granted.

Thereafter, in the case of *Wegoland Ltd. v. Nynex Corp.,* 806 F.Supp. 1112 (S.D.N.Y. 1992), aff'd 27 F.3d 17 (2d. Cir.1994), Judge Wood of this Court considered motions to

---

4. *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

dismiss a class action brought against a telephone utility alleging a Civil RICO conspiracy to defraud the plaintiff class of ratepayers, by giving misleading financial information to the regulatory agencies and consumers to support inflated rate requests. Judge Wood held that the RICO claims should be dismissed as nonjusticiable because of the Filed Rate Doctrine of the Supreme Court. Her conclusion was supported by two cases decided in 1992, after *LILCO,* in other circuits, *Carr v. Southern Co.,* 967 F.2d 1483 (11th Cir.1992) (en banc) *("Taffet II"),* cert. denied by *Taffet,* —— U.S. ——, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992) and *H.J., Inc. v. Northwestern Bell Telephone Co.,* 954 F.2d 485 (8th Cir.1992), cert. denied, —— U.S. ——, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992).

The district court opinion in *Wegoland* details the history of the Filed Rate Doctrine, beginning with the opinion of Justice Brandeis in *Keogh v. Chicago and Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), in which, in the context of a civil anti-trust claim a shipper alleged that the defendant carrier conspired to fix rates for transporting freight in interstate commerce. The Supreme Court held that where the rates charged had been filed with the Interstate Commerce Commission and inferentially were deemed reasonable by not being set aside, the district court should dismiss the case for failure to state a claim. The Supreme Court regarded the Commission's determination of the reasonableness of the rates as dispositive as to whether the rates were reasonable, even assuming that the filed rate was the product of a conspiracy. The theory of the *Keogh* case was that the filed rates determine the rights between the customer and the utility and the Interstate Commerce Act had provided a remedy for injured shippers and consignees, so that it was improbable Congress intended to afford another remedy under the Sherman

Act.[5] To permit courts to change rates unilaterally would result in unequal rates being charged to members of the same class of ratepayers (lower rates for plaintiffs) and because the court would, of necessity, determine whether the new rate it set was reasonable and non-discriminatory, such a determination would require reconstituting the whole rate structure for many other articles of freight moving in interstate commerce. As Judge Wood pointed out in *Wegoland,* subsequent decisions have amplified this well known doctrine and "further developed [its] rationale". *Id.* at 1114.

In *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), without explicitly referring to *Keogh* or the Filed Rate Doctrine itself, the Supreme Court held that despite the possibility of fraud, and although federal law provided the petitioner with no administrative remedy, the district court could not adjudicate a case based on fraud which would require a determination of what the reasonable rate would be in the absence of the fraud. This was considered to be "a nonjusticiable issue more appropriately determined by the Commission". *Wegoland,* 806 F.Supp. at 1114 (interpreting *Montana*).

Later, in *Arkansas Louisiana Gas Co v. Hall ("Arkla"),* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981), the Court held that the considerations underlying the filed rate doctrine "are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant". 453 U.S. at 577–78, 101 S.Ct. at 2930, cited in *Wegoland,* 806 F.Supp. at 1115. While the decision focuses on the need to avoid discrimination against non-plaintiff ratepayers, *Montana–Dakota* concentrates on the need for courts to refrain from adjudicating cases that

---

**5.** This is an expression of the "doctrine of clear statement", a rule of statutory construction used by the Supreme Court where there is an ambiguity, and literal application of a statute would be absurd or destroy established state procedures. The rule was discussed in *LILCO* (p. 1305 *et seq*) and rejected. The Filed Rate Doctrine is no more than a subsidiary rule, limited to regulated carriers or utilities, growing out of the doctrine of clear statement. Nobody has ever suggested that Congress could not make the Civil RICO Statute, or the Sherman Act for that matter, applicable to filed rates generally or filed rates obtained by fraud, if clearly it sought to do so in plain English. When and if the issue reaches the Supreme Court, it may well conclude that is just what Congress did.

would require them to apply the nonjusticiable standard of 'the reasonable rate' ". See, also, *Square D Company v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), a case similar to *Keogh* where it was claimed that regulated rates had been inflated through an anti-trust violation.

Judge Wood's opinion then addressed the *LILCO* case, observing that "the parties in *LILCO* did not address the Filed Rate Doctrine and the Second Circuit's opinion maintained complete silence on that issue, mentioning neither the doctrine nor any of the cases decided under the doctrine". *Id.* at 1122.

As noted earlier, this Court believes the result in *LILCO* was probably consistent with the *result* in the Filed Rate cases because its affirmance of the district court's grant of Judgment Notwithstanding the Verdict in favor of the utility, which is the bottom line in *LILCO*, essentially makes the rest of the discussion dicta. Judge Wood expressed it differently: "although *LILCO* in no way forecloses the application of the Filed Rate Doctrine in the present cases, there does appear to be some theoretical tension between *LILCO* and the applicability of the Filed Rate Doctrine in this case." *Id.* at 1123.

We now turn to the disposition of *Wegoland* in the Court of Appeals, by a different panel than that which decided *LILCO*. On May 24, 1994, a panel of our Court of Appeals affirmed Judge Wood's decision in *Wegoland,* "for substantially the reasons articulated in Judge Wood's thorough and commendable opinion." The Court of Appeals in *Wegoland,* after reviewing the history of the Filed Rate Doctrine concluded that, "because a fraud exception to the Filed Rate Doctrine is both contrary to guiding Supreme Court precedent and important regulatory policies, we hold that there is no fraud exception to the Filed Rate Doctrine that would save this suit from dismissal.[6]

The panel in *Wegoland* then addressed *LILCO:*

"We conclude that *LILCO* erects no barrier in this Circuit to the application of the Filed Rate Doctrine to RICO suits brought by ratepayers against utilities. Since we had no occasion to consider the Filed Rate Doctrine in *LILCO* because *it was not brought to the panel's attention,* the absence of such discussion can by no means be construed as an implicit rejection of the Filed Rate Doctrine. Accordingly, the *LILCO* decision does not alter the outcome in this case." (Emphasis added)

This is truly astonishing; it assumes that such a long standing legal Doctrine of the Supreme Court, and the subsequent cases considering the possibility of a fraud exception to that Doctrine, were unknown to the skilled attorneys on both sides of *LILCO,* to the distinguished panel of judges who presided in *LILCO,* and their numerous law clerks.[7] Surely this complete disapproval of *LILCO,* whatever the reasoning, is a sudden development which leaves the plaintiffs in this case, and its counsel, who relied on *LILCO* in drafting this complaint, in a quandary, faced with a major and unforeseen apparent change in the case law of this Circuit.

Subsequent decisions confirm that a claim of this sort is not actionable under civil RICO. See, *Gelb v. American Telephone and Telegraph Co.,* 813 F.Supp. 1022 (S.D.N.Y.1993) and *Fersco v. Empire Blue Cross/Blue Shield of New York,* 92 Civ. 4226, 1994 WL 445730 (JFK) decided August 17, 1994, dismissing a complaint on its face pursuant to the Filed Rate Doctrine. The case of *Nordlicht v. New York Telephone Co.,* 799 F.2d 859 (2d Cir.1986), cert. denied 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987), relied on by plaintiffs, is not to the contrary. It was decided prior to *Wegoland,* and is distinguishable on its facts, which appear to involve damage resulting not from the filed rate itself, but from the failure to convert Canadian dollars to American. In *Nordlicht,*

**6.** This Court regards the last clause of the quote as redundant. The panel meant to say simply that there is no fraud exception.

**7.** As we point out in footnote # 4, reference to the doctrine of clear statement in the *LILCO*

opinion subsumes the Filed Rate Doctrine both by history and as a matter of logic.

*Keogh* was cited with approval (at p. 866) and the sanctity of the actual tariff(s) was not disturbed.

■ By a submission dated August 31, 1994, plaintiffs seek to distinguish *Wegoland* and *Fersco* by asserting that, "[*Fersco*] involved an alleged fraud in the process of arriving at the approved rate to be charged the defendant's insureds. The instant action involves illegal use of ratepayer funds after collection of funds and the illegal misapplication of such funds. In this regard, the funds are ratepayer funds if they are above-the-line funds [8] used for illegal purposes." Plaintiff also points out that, "Additionally plaintiffs here also rely on illegal acts of extortion and bribery, separate and distinct from fraud (e.g. mail fraud and wire fraud). Moreover, the claim addresses fraudulent inducement of ratepayers directly, particularly the gas ratepayers."

This Court disagrees with the analysis that "the funds are ratepayer funds". They are not. The funds stolen or diverted were, directly or indirectly, funds of O & R itself. This is so notwithstanding the limitations on the *use* of such revenues in the hands of O & R found in § 107 of the New York Public Service Law. Funds extorted from O & R's vendors and suppliers are, in economic reality, the funds of O & R. In any event, they are not funds of the plaintiff class. As the Supreme Court made clear in 1922, the ratepayers have to pay the rates; they did so. The amounts of the rates were allowed by the Public Service Commission higher than they should have been based on test year results which were arguably distorted by inclusion of some part of the alleged financial depredations which were committed against the utility and its vendors by faithless officers, as well as distorted by other alleged fraudulent representations made directly to the Commission. And, a claim for damages by a ratepayer class for such financial injury is simply not actionable here, in light of the Filed Rate Doctrine. No logical basis appears to allow the maintenance of the action

by ratepayers against the individuals who acted for the utility in this sorry situation, or their corporations. It would be anomalous if the utility were to go free of RICO, and the individuals who acted for the utility should remain liable.

The motion to dismiss is granted in all respects as to all defendants. In light of the unforeseen and rather astounding recent twist and turn in our controlling jurisprudence, this Court concludes that there shall be no costs.

The Clerk shall enter final judgment, which shall be without prejudice as to claims arising under state law. No costs.

SO ORDERED.

---

**8.** "Above the line" is a term of art in rate regulation. It comprises those operational costs which are considered in fixing rates, in order to arrive at pro forma revenue which will cover operating

expenses, overhead, depreciation and a fair return on the original cost, less depreciation, of property used and useful in rendering service.